## HALL *v.* DEVOE MANUF'G Co

*(District Court, D. New Jersey.* November 14, 1882.)

1. JURISDICTION—FEDERAL COURTS.

   The extent of the jurisdiction of the federal courts cannot be restricted or enlarged by state legislation or agreement; but such legislation or agreement may give definiteness or certainty to questions which congress had necessarily left undetermined.

2. SAME—COMPACT BETWEEN STATES.

   By the compact entered into in 1833 between the states of New York and New Jersey, approved by act of congress, June 28, 1834, (4 St. at Large, 711,) it was agreed that the state of New York has exclusive jurisdiction of and over all the waters of Hudson river, and of and over the lands covered by the said waters, to the low-water mark on the New Jersey shore; and the state of New Jersey has the exclusive right of property in and to the land under the water lying west of the middle of the river, and exclusive jurisdiction of and over the wharves, docks, and improvements made and to be made on the Jersey shore, and on vessels aground on said shore, or fastened to any such wharf or dock, (except as to quarantine regulations,) and the exclusive right of regulating the fisheries on the westerly side of the middle of the river.

3. SAME—DISTRICT OF NEW JERSEY.

   A vessel fastened to a wharf or pier on the western side of the Kill von Kull is within the exclusive jurisdiction of New Jersey.

   Denying *The L. W. Eaton,* 9 Ben. 289.

Libel *in personam.*

*Scudder & Carter,* for the Devoe Manufacturing Company.

*Beebe, Wilcox & Hobbs,* for libelant.

NIXON, D. J. A libel *in personam* was filed in the above case, alleging as the cause of action a collision between the canal-boat T. W. Griffin, whereof the libelant was owner, and the tug-boat F. W.

Devoe, whereof the Devoe Manufacturing Company was owner.   The collision occurred in March, 1882, on the East river, near the mouth of Newtown creek, in the eastern district of New York.   A monition issued with the usual attachment clause.   The marshal has made his return that the respondent, a foreign corporation, was not found in his district, and that he had seized the tug-boat F. W. Devoe, and held the same to respond to the libelant's claim for damages.   A motion is now made to set aside the service of process on the ground of a want of jurisdiction in the court.

It appears from affidavits filed and used at the hearing that on the twenty-seventh of October last, when the seizure was made by the marshal, the F. W. Devoe was lying in the Kill von Kull, between Staten Island and New Jersey, fastened to the end of a dock at Bayonne, in New Jersey, two or three hundred feet below low-water mark, and about half a mile from the entrance to the bay of New York.   The proctor for the respondent insists that although the tug, when seized, was fastened to a pier extending into the water from the New Jersey shore, she was lying below low-water mark in Kill von Kull, and hence was within the exclusive jurisdiction of the eastern district of the state of New York.   The precise claim is that in all admiralty proceedings the jurisdiction of the district court of the United States for the southern and easterns district of New York extends over the waters of the Hudson river and Kill von Kull to low-water mark on their western shores, to the exclusion of the district court of the United States for the state of New Jersey.   The question is an important one, involving large interests, and demands careful consideration.   If the construction contended for can be fairly given to the legislation of congress in defining the judicial districts of New Jersey and New York, the people of the first-named state have been laboring under a delusion for many years in regard to its territorial boundaries, and the judges of this court have been exercising unwarrantable authority over cases in admiralty which should have been tried and determined in the districts of our sister state.

The question came before the late circuit judge (BLATCHFORD) of the southern district of New York, in 1878, in the case of *The Schooner L. W. Eaton,* and seems to have been examined by him with great care. 9 Ben. 289.   The vessel had been attached by the marshal.of the New York district on the first of April, 1875, being at the time afloat, and fastened by means of lines to a dock at Jersey City and outside of low-water mark, the wharf projecting into the navigable waters of the Hudson river, west of Manhattan island, and to the south of the

mouth of Spuyten Duyvil creek. A motion was made on behalf of the claimant to discharge the attachment, on the ground that the vessel was not, at the time of the seizure, in the jurisdiction of the court. The learned judge denied the motion and filed an elaborate opinion, in which he held—

(1) That it was the established law of that district that the *locus in quo* in such a case was within the jurisdiction of the southern district of New York in admiralty; (2) that said jurisdiction existed prior to the agreement of September 16. 1833, between New York and New Jersey, which agreement is set forth in the act of congress of June 28, 1834, (4 St. at Large, 708) and that nothing within the agreement or the act restricted the jurisdiction; and (3) that sections 541 and 542 of the Revised Statutes did not have the effect of altering the jurisdiction.

It is quite obvious, from carefully reading his opinion, that when he assumed it was the established law of his district that the *locus in quo* was within his jurisdiction, the judge only meant to assert that his distinguished predecessor, Judge BETTS, had so declared the law. I cannot find that the question was ever discussed before May, 1860, when it arose before Judge BETTS in the case of *U. S.* v. *Ship Julia Lawrence*.* His opinion was never published in any volume of his admiralty decisions, and its full text first appears in Judge BLATCHFORD's opinion. The jurisdiction of the New York court over the place of the seizure was challenged in that case, it being admitted on both sides that the ship when seized was attached to a pier or dock on the New Jersey side of the river and upon waters of the bay. Judge BETTS states that two questions were debated before him on the issue of law. The first regarded the actual boundary line of the southern district of New York. He does not say what the second was, but it is to be inferred from his subsequent reasoning that it had reference to the effect which the arrangement entered into between the states of New York and New Jersey respecting their mutual boundary line had upon the antecedent legislation of congress. He correctly holds that any variation of the line, made by the assent of New York, subsequent to the establishment of the United States judicial districts, would not affect the dimensions and authorities of those districts, without the full concurrence of the government of the United States in such change.

Entertaining such profound respect for the opinion of this able judge, I wish to suggest, with much diffidence, that the unsound conclusions which he reached arose from two false assumptions. He as-

*6 Amer. Law. Rev. 383.

sumed (1) that the judiciary act of 1789 fixed the boundary line of the district of New York to low-water mark on the western shore of Hudson river; and (2) that the agreement entered into in 1833, between New York and New Jersey, in regard to the boundary, altered or changed some previously-existing line. If it can be shown that no foundation in fact existed for such premises, not much weight should be given to the conclusions drawn from them.

1. As to the first assumption, the second section of the judiciary act, approved September 24, 1789, (1 St. at Large, 73,) divides the United States into 13 judicial districts, and its only statements in regard to New Jersey and New York are, "one to consist of the state of New York, and to be called the New York district, and one to consist of the state of New Jersey, and to be called the New Jersey district." It is an historical fact that at that time there was an existing controversy between these states respecting the proper running of the line dividing their jurisdiction—New York claiming the whole of the Hudson river to the low-water mark of the western shore, and New Jersey insisting that her teritorial boundary extended to the middle of the river. Congress did not attempt to settle the conflict; expressed no opinion on the question of boundary; but simply constituted the districts, limiting their jurisdiction to state lines, wherever the interested parties should afterwards determine these lines to be.

I find nothing more definite in this respect in the act of April 9, 1814, (3 St. at Large, 120,) when congress divided New York into two districts, although Judge BETTS states in his opinion that he discovers there "more distinctness of discrimination in the restatement of the boundary line" than he did in the act of 1789. The only reference to the subject is in the first section, where it is enacted that "the counties of Rensselaer, Albany, Schenectady, Schoharie, and Delaware, together with all that part of the state lying south of the above-named counties, shall compose one district, to be called the southern district of New York, and all the remaining part of the said state shall compose another district, to be called the northern district of New York."

His honor, Judge BLATCHFORD, seems to lay great stress upon the fact that "by the Revised Statutes of New York, which took effect January 30, 1830, it was declared that the boundary of the state of New York, as its jurisdiction was then asserted, ran from a point on the west side of the Hudson river, in the latitude of 41 degrees north, southerly along the west shore at low-water mark of Hudson river, of

the Kill von Kull, of the sound between Staten Island and New Jersey, and of Raritan bay to Sandy Hook, in such manner as to include * * * all the islands and waters in the bay of New York, and within the bounds above described. Clearly," says the learned judge, "the *locus in quo* in this case [Eaton] was, by such description, within the state of New York, and it was therefore within the southern district of New York."

In reply it may be suggested that many years before, to-wit, on the third of December, 1807, the legislature of New Jersey passed an act which declared, after reciting in the preamble that the commissioners of the states of New York and New Jersey had met and failed to come to an amicable adjustment of the eastern boundary line of the state, and that it was necessary to preserve the lawful jurisdiction of the state until the existing controversy was brought to a legal conclusion and determination, that the boundary line of the county of Bergen (then adjoining the Hudson river, Kill von Kull, and New York bay) extended to the middle or midway of the waters adjoining said county, and imposed severe penalties upon all persons who attempted, without authority from New Jersey, to execute legal process therein. Would it not be quite as pertinent to respond: "Clearly, the *locus in quo* in this case was by such description within the state of New Jersey, and was therefore within the jurisdiction of its district court?"

It may be added in this connection that the act to create the eastern district of New York was approved February 25, 1865, and the language there employed reveals the same congressional intention to limit the jurisdiction to state lines. The first section declares that the counties of Kings, Queens, Suffolk, and Richmond, in the state of New York, with the waters thereof, are constituted a separate judicial district of the United States, to be styled the eastern district of New York. The second section gives to the district court of the eastern district concurrent jurisdiction with the district court for the southern district over the waters within the counties of New York, Kings, Queens, and Suffolk, in the state of New York, and over all seizures made and matters done in such waters. By a singular oversight no concurrent jurisdiction was provided for the county of Richmond (Staten Island) and its waters; and as the Kill von Kull are, in part, the waters between the county of Richmond, in New York, and the state of New Jersey, the *locus in quo* in this case, if not in New Jersey, is within the exclusive jurisdiction of the eastern district. This district is expressly limited to counties in the state of

New York, and as it has been created long since the year 1833, when the two states definitely settled their boundaries, it will hardly be insisted that its jurisdiction is not to be limited and determined by the agreement or compact of 1833. But I prefer to put my denial of the motion in this case upon other and higher ground.

2. The second assumption is that the agreement of 1833 altered or changed some previously-existing boundary line between the states. It did not alter or change what was before fixed, but rather established what was before unsettled. It is conceded that New York had always claimed the whole of Hudson river to low-water mark on the western shore; but New Jersey never acceded to the claim. In colonial times her authorities had insisted that a just construction of the grant from the Duke of York to Berkley and Carteret allowed the jurisdiction of the province to extend to the middle of the Hudson river. At the close of the revolutionary war the state renewed the contention on the additional ground that her boundary was thus secured by reason of the conquest from the British crown. The controversy led to the appointment of commissioners by the respective states, first in 1806, then in 1824, and finally in 1833, to adjust the conflicting claims. A brief reference to the legislation of the two states will show the nature, character, difficulty, and result of the contest.

On the twenty-first of November, 1806, (Pub. Laws, 751,) the legislature of New Jersey, after a long preamble setting forth with minute particularity the claims of the state under its colonial charter and by right of conquest from the mother country, appointed five commissioners, with full power and authority on behalf of New Jersey to meet and make a final agreement with commissioners to be appointed on behalf of New York, "to settle the limits and extent within which they shall exercise their rights of jurisdiction respectively in and over all the waters lying and being between the shores of said states; and, further, to settle the eastern boundary of New Jersey, as to them may seem just and reasonable."

The legislature of New York promptly responded, and on the third of April following (Pub. Laws 1807, p. 124) appointed five commissioners to meet those from New Jersey "to settle all disputed claims as to territory and jurisdiction." The commissioners met, and as neither side was prepared to recede from the position of the respective states, they separated without coming to an agreement.

On the third of December, 1807, (Pub. Laws, 13,) the legislature of New Jersey passed the act above referred to, wherein, after reciting the failure of the commissioners to come to any amicable ad-

justment of the eastern boundary of the state, again asserted the right of New Jersey to extend to the middle of the Hudson river; prescribed the punishment to be inflicted upon all persons who, without the leave of the state, attempted to exercise any authority thereover; placed in the hands of the governor $3,000 to be expended by him in prosecuting and defending to final judgment any suit or suits which he deemed necessary for finally determining the jurisdictional line between the states; and also renewed the powers of the commissioners before appointed to resume negotiations, provided the state of New York authorized its commissioners to do the same.

The legislature of New York answered on the sixth day of April following (Pub. Laws 1808, p. 313) by reiterating the claim of the state to the whole of Hudson river, and imposing penalties upon all persons who attempted to exercise any authority thereon under the state of New Jersey.

No further steps for the settlement of the controversy were taken on either side until December 10, 1824, when the legislature of New Jersey enacted another law, authorizing the governor to appoint five commissioners, to meet a like number to be chosen by New York, to determine the limits of territory and jurisdiction between the two states. No notice being taken of this by New York, and the law expiring by its own limitation on the first of December, 1826, (Pub. Laws, 25,) the legislature revived and continued in force the act until November 1, 1827.

The legislature of New York responded on the twenty-seventh of April following, (Pub. Laws 1827, p. 326,) and after reciting in a preamble that New York was always disposed to settle any differences that existed between her and any neighboring state upon amicable principles, appointed five commissioners with full powers, to meet the commissioners of New Jersey, "to agree upon, settle, and determine the limits of territory and jurisdiction between said states. These commissioners also failing to come to any agreement, the New Jersey commissioners, in 1827, proposed to have the controversy in respect to the boundary submitted to the supreme court of the United States, as an impartial tribunal, to arbitrate between the parties, which the New York commissioners declined.

All attempts at adjustment proving abortive, on the sixth of March, 1828, (Pub. Laws, 199,) the legislature of New Jersey determined to bring the question to a close, and passed an act reciting in a pre-

amble that disputes had existed for many years between the states of New Jersey and New York relative to the eastern boundary of New Jersey, and more particularly as the said boundary concerned the Hudson river and adjacent waters, and that several unavailing efforts had been made on the part of New Jersey to settle said disputes by amicable negotiation, and then directed the attorney general of the state to institute legal proceedings in the supreme court of the United States, in the name and on behalf of the state of New Jersey, against the people of the state of New York, for the purpose of ascertaining and establishing the questions relative to boundary and jurisdiction between the states as they respected the eastern boundary of New Jersey. Such suit was begun in the month of June, 1829. The bill filed alleged—

"That the state of New Jersey was justly entitled to the exclusive jurisdiction and property of and over the waters of Hudson river from the forty-first degree of north latitude to the bay of New York, to midway of said river, and to the midway or channel of said bay of New York, and the whole of Staten Island sound, together with the land covered by the water of said river, bay, and sound to the like extent."

The governor of New York, in a message, called the attention of the legislature to the pendency of said suit. See *People* v. *Cent. R. Co. of N. J.* 42 N. Y. 291. For the first time during the whole continuance of the dispute the legislature of New York now took the initiative in renewing negotiations, and on the eighteenth of January, 1833, passed an act (Pub. Laws, 6) authorizing the governor to appoint three commissioners to meet commissioners who might be appointed by the state of New Jersey to negotiate and agree respecting the territorial limits and jurisdiction of the two states." New Jersey at once responded, and on the sixth of February following empowered the governor to appoint three commissioners to meet those appointed by the governor of New York under the provisions of the foregoing act, and with them "to negotiate and agree respecting the territorial limits and jurisdiction as to them might seem just." The commissioners appointed by the governors of the respective states under this legislation were six of their eminent public men—Benjamin F. Butler, Peter Augustus Jay, and Henry Seymour, on the part of New York, and Theodore Frelinghuysen, James Parker, and Lucius Q. C. Elmer, on the part of New Jersey. After several conferences they came to an amicable adjustment of the conflicting claims on the sixteenth of September, 1833, in the city of New York. By article 8

of the agreement it was not to become binding on the two states until confirmed by the legislatures thereof, respectively, and approved by the congress of the United States. It was ratified and confirmed by the state of New York on the fourth day of February, 1834, by the state of New Jersey on the twenty-sixth of February, 1834, and approved by congress June 28, 1834. 4 St. at Large, 711.

I think it is conclusive from this review of the claim and action of the two states in regard to their boundary line, and the methods adopted for its amicable adjustment, that the question was an open one in 1789, and that no settlement was reached until the agreement of the commissioners was ratified and approved in 1834. It is not to be assumed, as my learned brethren of the New York district assume, that congress, in creating the districts of New York and New Jersey, adopted the claim of boundary then made by New York rather than the claim of New Jersey. It follows from this view that the agreement or compact of 1833 must be regarded as rendering certain what was before uncertain respecting the territorial jurisdiction of the district courts of the United States for New York and New Jersey. While it is admitted that the extent of the jurisdiction of the federal courts cannot be restricted or enlarged by any state legislation or agreement, I see no difficulty in invoking such legislation or agreement to give definiteness and certainty to questions which congress had necessarily left vague and undetermined.

We are now brought to the inquiry, what adjustment was made by the commissioners of these long-pending conflicting claims? The subject-matter of the reference was territorial limits and jurisdiction. The first article of the compact relates to the division of the territory in dispute, and the remaining articles to the jurisdiction over the same. Article 1 fixes the boundary line between the two states from a point in the middle of Hudson river, opposite the point on the western shore thereof, in the forty-first degree of north latitude, as heretofore ascertained and marked, to the main sea—at the middle of the said river, of the bay of New York, of the water between Staten Island and New Jersey, and of Raritan bay, to the main sea—except as therein otherwise particularly mentioned.

Mr. Justice ELMER, the last surviving member of the commission, and whose thorough knowledge of all the steps leading to the agreement places him in a favorable position to interpret its precise meaning, has so succinctly stated the substance of the various articles in regard to jurisdiction, that I shall content myself with quoting his language. In the case of *State* v. *Babcock*, 30 N. J. Law, 30, he says:

"By the compact  *  *  *  the state of New York has exclusive jurisdiction of and over all the waters of Hudson river, and of and over the lands covered by the said waters to the low-water mark on the New Jersey shore; and the state of New Jersey has the exclusive right of property in and to the land under the water lying west of the middle of the river, and exclusive jurisdiction of and over the wharves, docks, and improvements made and to be made on the Jersey shore, and on vessels aground on said shore, or fastened to any such wharf or dock, (except as to quarantine regulations,) and the exclusive right of regulating the fisheries on the westerly side of the middle of the river."

The learned Judges BETTS and BLATCHFORD seem to attach much importance to the fact that congress, when it ratified the state compact, added a proviso that nothing therein contained should be construed to impair or in any manner affect any right of jurisdiction of the United States in and over the islands or waters which formed the subject of the agreement. This was probably added from excess of caution on the part of the legislature. It is not apparent how the mere assent of the national government to the adjustment of boundaries and jurisdiction between states, whereby the exercise of authority by federal courts on each side of the line is definitely determined, could in any manner affect a right of jurisdiction of the United States.

The vessel being fastened to a wharf or pier on the western side of the Kill von Kull, was within the exclusive jurisdiction of New Jersey, and the motion to set aside the attachment must be denied.

---

TERRITORIAL EXTENT OF JURISDICTION. The jurisdiction of the United States courts is in general restricted to the territorial limits within which they are placed.(a) And they cannot send their process outside these limits except where specially authorized to do so by congress.(b) A court created within and for a particular territory is bounded in the exercise of its power by the limits of such territory.(c) Whatever may be the extent of the jurisdiction over the subject-matter, in a suit in respect to jurisdiction over persons and property, it can only be exercised within the limits of the judicial district.(d) The circuit court has jurisdiction only over the inhabitants of the district, or persons found therein, and served with process.(e) The jurisdiction of the circuit court is co-extensive with the limits of the state.(f) Where there are two districts in a state, a citizen of such state is liable to suit in either

(a) Wilson v. Graham, 4 Wash. C. C. 53; U. S. v. Alberty, Hempst. 444.

(b) Ex parte Graham, 3 Wash. C. C. 456.

(c) Picquet v. Swan, 5 Mason, 35; Ex parte Graham, 3 Wash. C. C. 456.

(d) Toland v. Sprague, 12 Pet. 300; Picquet v. Swan, 5 Mason, 35.

(e) Pollard v. Dwight, 4 Cranch, 424; Anderson v. Shaffer, 10 Fed. Rep. 266.

(f) Shrew v. Jones, 2 McLean, 78.

district if served with process.(*g*) Although consent of parties cannot confer jurisdiction on a court of the United States, yet the parties may admit the existence of facts. and the court may found its jurisdiction on such admission.(*h*) An action may be maintained in the circuit court, although the right to sue is given by a state law;(*i*) but the party must take his remedy in the same manner as he would in any other competent tribunal, and may be enjoined in a proper case.(*j*) A municipal corporation may be sued although the statute creating it exempts it from suits elsewhere than in the state court.(*k*)

NOT AFFECTED BY STATE LEGISLATION. The jurisdiction of the United States courts cannot be affected by state legislation. They will enforce equitable rights if they have jurisdiction of the subject-matter and the parties.(*l*) And the fact that the legislature has conferred jurisdiction on state courts to enforce such rights does not oust the jurisdiction of the federal courts.(*m*) The state legislature cannot authorize the institution of a suit against a receiver appointed by a federal court,(*n*) nor can it require leave of court before bringing an action on a judgment rendered by a state court.(*o*)

SOUTHERN DISTRICT OF NEW YORK. The following are the cases affected by the above decision: The district court for the southern district of New York has jurisdiction over a vessel attached in the Morris canal basin, at Jersey City.(*p*) Its jurisdiction does not extend below low-water mark on the New Jersey shore.(*q*) It has jurisdiction, although the vessel, when seized, was attached to a pier on the New Jersey side of the North river, and upon the waters of the bay.(*r*) The L. W. Eaton was attached by the marshal under process issued by the district court for the southern district of New York, while she was afloat in the navigable waters of the Hudson river, lying west of Manhattan island, and to the south of the mouth of Spuyten Duyvil creek, and where the tide ebbed and flowed, she being fastened by means of a line to a dock at Jersey City, in the State of New Jersey, and outside low-water mark, said wharf projecting into the navigable waters of the Hudson river lying west of Manhattan island, and to the south of the mouth of Spuyten Duyvil creek.(*s*)—[ED.

(*g*) McMicken v. Webb, 11 Pet. 25; Vore v. Fowler, 2 Bond, 294; Locomotive Co. v. Erie R. Co. 10 Blatchf. 292.

(*h*) Ry. Co. v. Ramsey, 22 Wall. 322.

(*i*) Holmes v. O. & C. R. Co. 5 Fed. Rep. 75; Keith v. Rockingham, 2 Fed. Rep. 831.

(*j*) City Bank v. Skelton, 2 Blatchf. 26.

(*k*) Cowles v. Mercer Co. 7 Wall. 118; Cunningham v. Ralls, 1 Fed. Rep. 453.

(*l*) Smith v. Railroad Co. 99 U. S. 399. See Persons v. Lyman, 5 Blatchf. 170; Livingston v. Jefferson, 1 Brock. 203; Dennick v. Railroad Co. 103 U. S. 11.

(*m*) Benjamin v. Cavaroc, 2 Woods, 168.

(*n*) Hale v. Duncan, 7 Cent. Law J. 146. See West. U. Tel. Co. v. Atlantic & P. T. Co. 7 Biss. 367.

(*o*) Phelps v. O'Brien Co. 2 Dill. 518.

(*p*) The Argo, 7 Ben. 301.

(*q*) Malony v. City of Milwaukee, 1 Fed. Rep. 611.

(*r*) U. S. v. The Julia Lawrence, synopsis of opinion, 6 Amer. Law Rev. 383, cited in full; The L. W. Eaton, 9 Ben. 291.

(*s*) The L. W. Eaton, 9 Ben. 289, denied.