STATE OF NEW JERSEY, PLAINTIFF-PETITIONER, v. GEORGE CARLAFTES, SOLOMON KIMMELL, AND FRANK TAMBONE, DEFENDANTS-RESPONDENTS.

Argued April 29, 1957—Decided June 10, 1957.

*Mr. David M. Satz, Jr.,* Deputy Attorney-General, argued the cause for the plaintiff-petitioner (*Mr. Grover C. Richman, Jr.,* Attorney-General, attorney; Miss June Strelecki, Legal Assistant, on the brief).

*Mr. Ira J. Katchen* argued the cause for the defendants-respondents.

The opinion of the court was delivered by

BURLING, J. The defendants were arrested by members of the New Jersey State Police and the Monmouth County Prosecutor's Office for violations of the gambling laws, *N. J. S.* 2*A* :112–1 *et seq.* The summary arrests took place on August 4, 1955 on board the *S. S.* Peter Stuyvesant, a New York excursion vessel, carrying passengers from New York City to Atlantic Highlands, New Jersey. At the time, the ship was moving in the waters of Sandy Hook Bay, south of the territorial boundary between the States of New York and New Jersey and approximately ½ mile off the New Jersey shoreline, seaward of low water mark. Upon reaching shore the defendants were taken before a municipal magistrate of Middletown Township, Monmouth County, and held under bail. The Monmouth County grand jury returned an indictment against them charging violations of *N. J. S.* 2*A* :112–1 and 3 of the gambling laws. When the case came on for trial defendants' counsel moved the indictment be dismissed for lack of jurisdiction over the defendants and the subject matter, contending that by virtue of the Compact of 1834 between New Jersey and New York the latter state exercised exclusive jurisdiction over the waters where the arrests took place and the alleged offenses occurred. The

Monmouth County Court agreed and the indictment was dismissed. The State appealed to the Superior Court, Appellate Division, *R. R.* 3:5–5(7), and we certified the cause prior to a review below.

 Here a case arising out of the routine enforcement of the gambling laws develops into one of major importance. The defendants, non-residents, declined to instruct their counsel to defend the appeal and the Appellate Division relieved him of further representation. (Defendants are taking a calculated risk in their course of action, compare *Landy v. Lesavoy,* 20 *N. J.* 170 (1955), as a reversal will operate to reinstate the indictment.) This court, however, requested the attorney to brief and argue the matter because of the question involved.

The question presented for decision is whether New Jersey ceded any portion of its otherwise exclusive jurisdiction to New York under the Compact of 1834 over the waters lying off Monmouth County and westerly of Sandy Hook, all of which lie within the New Jersey territorial boundary as established by that Compact.

The Compact of 1834 marked the culmination of a long dispute between the two states over sovereign rights in the waters of the Hudson River, New York Bay and the Kill von Kull. We need not restate the adverse claims advanced nor trace the historically interesting path which preceded the Compact. See *Fernow, Historical Sketch of the Boundary Line Between the States of New York and New Jersey, Appendix* 8, New Jersey Boundary Line Pamphlets (State Library), for the earlier phase of the controversy, and *Hall v. Devoe Mfg. Co.,* 14 *F.* 183 (*D. C. N. J.* 1882), prohibition denied 108 *U. S.* 401, 2 *S. Ct.* 894, 27 *L. Ed.* 764 (1883), for the later chapter. Commissioners were appointed by New Jersey in 1806 and again in 1824, followed by similar action of New York, to negotiate a settlement. Their efforts were unavailing. In 1828 the New Jersey Legislature directed the Attorney-General to institute legal proceedings in the United States Supreme Court. The bill filed in that court (in 1829) alleged, *inter alia,*

"* * * the State of New Jersey is justly and lawfully entitled to the exclusive jurisdiction and property of and over the waters of the Hudson, from the forty first degree of latitude, to the bay of New York, to the *filum aquae* or midway of the said river; and to the midway or channel of the said bay of New York, and the whole of Staten-Island Sound, together with the land covered by the water of the said river, bay and sound in the like extent." (P. 22, Bill to Settle Boundary, etc., New Jersey Boundary Line Pamphlets, (State Library).)

The case was never adjudicated on the merits. In 1833 New York again appointed commissioners, as did New Jersey, and agreement was finally reached. The accord was ratified and confirmed by both states in February 1834, and approved by the United States Congress in June 1834. 4 *Stat.* 708 (1834).

The Compact (*R. S.* 52:28–1 *et seq.*) contains eight articles. The decision here turns upon a construction of Article III, but in order to understand what the Compact sought to accomplish the following articles are set forth:

Article I. (This article concerns *territorial* boundary)

"The boundary line between the states of New York and New Jersey, from a point in the middle of Hudson river, opposite the point on the west shore thereof, in the forty-first degree of north latitude, as heretofore ascertained and marked, to the main sea, shall be the middle of the said river, of the bay of New York, of the water between Staten island and New Jersey, and of Raritan bay, to the main sea, except as hereinafter otherwise particularly mentioned."

Article III. (This article concerns *extra-territorial jurisdiction* of New York.)

"The state of New York shall have and enjoy exclusive jurisdiction of and over all the waters of the *bay of New York*, and of and over all the waters of Hudson river, lying west of Manhattan island, and to the south of the mouth of Spuyten Duyvel creek, *and of and over the lands covered by the said waters to the low-water mark on the westerly or New Jersey side thereof*, subject to the following rights of property and jurisdiction of the state of New Jersey, that is to say that:

1. The state of New Jersey shall have the exclusive right of property in and to the land under water, lying west of the middle of the bay of New York and west of the middle of that part of the Hudson river which lies between Manhattan island and New Jersey.

2. The state of New Jersey shall have the exclusive jurisdiction of and over the wharves, docks and improvements made and to be made on the shore of the said state, and of and over all vessels aground on said shore, or fastened to any such wharf or dock, except that the said vessels shall be subject to the quarantine or health laws, and laws in relation to passengers of the state of New York, which now exist or which may hereafter be passed.

3. The state of New Jersey shall have the exclusive right of regulating the fisheries on the westerly side of the middle of the said waters; provided, that the navigation be not obstructed or hindered." (Emphasis supplied.)

Article V. (This article concerns *extra-territorial jurisdiction* of New Jersey.)

"The state of New Jersey shall have and enjoy exclusive jurisdiction of and over all the waters of the sound between Staten island and New Jersey, lying south of Woodbridge creek, and of and over all the waters of Raritan bay, lying westward of a line drawn from the lighthouse at Prince's bay to the mouth of Matavan creek, subject to the following rights of property and jurisdiction of the state of New York, that is to say:

1. The state of New York shall have the exclusive right of property in and to the land under water lying between the middle of the said waters and Staten island.

2. The state of New York shall have the exclusive jurisdiction of and over the wharves, docks and improvements made and to be made on the shore of Staten island, and of and over all vessels aground on said shore, or fastened to any such wharf or dock, except that the said vessels shall be subject to the quarantine or health laws and laws in relation to passengers of the state of New Jersey, which now exist or which may hereafter be passed.

3. The state of New York shall have the exclusive right of regulating the fisheries between the shore of Staten island and the middle of the said waters; provided, that the navigation of the said waters be not obstructed or hindered."

Thus, although the territorial demarcation is a line running through the middle of the Hudson River and New York Bay, Staten Island Sound and Raritan Bay (Art. I), the State of New York was invested with an extra-territorial jurisdiction over all the waters of New York Bay and the Hudson River (south of Spuyten Duyvel Creek—which marks the northern boundary of Manhattan) via Article III, and New Jersey a like jurisdiction over a portion of Raritan Bay via Article V.

The first New Jersey decision of prominence touching the 1834 Compact was *State v. Babcock,* 30 *N. J. L.* 29

(*Sup. Ct.* 1862), where the former Supreme Court decided that by virtue of the cession of jurisdiction over the Hudson River to New York (Art. III), New Jersey was deprived of exercising its criminal jurisdiction over offenses which occurred easterly of the low water mark on the New Jersey side of the river. The opinion was written by Justice Elmer, who had served as a commissioner in fashioning the 1834 Compact. In presenting the basic purpose for achieving an extra-territorial jurisdiction for New York via Article III and for New Jersey via Article V, he stated:

"When the commissioners of New Jersey and New York again met, in 1833, and it was found that those of the latter state appeared to be desirous of arranging the dispute upon fair and liberal terms, but deemed it indispensable that their great commercial emporium should have the exclusive control of the police on the surrounding waters, and full power to establish such quarantine regulations as should be found necessary, the commissioners of this state deemed it wise to secure the exclusive property in the soil to the middle of the river, and exclusive jurisdiction over the wharves, docks, and other improvements made or to be made on the Jersey shore, and of the vessels fastened thereto, and the right to regulate the adjacent fisheries, leaving to New York, which was thought to be quite as much a burthen as a privilege, the exclusive jurisdiction over the offences in or upon the waters or the land covered by the water outside of the low water mark. As it was thought possible that the time might come when Perth Amboy should be an important city, like exclusive jurisdiction over the adjacent waters to low water mark on Staten Island was secured to this state." (30 *N. J. L.*, at *pages* 33–34)

Later decisions proceeded to define the nature of this special jurisdiction which New York might exercise exclusively over a portion of New Jersey's territory, and New Jersey over New York's lands. In *People v. Central R. Co. of New Jersey,* 42 *N. Y.* 283 (*Ct. App.* 1870), the Attorney-General of New York sought to abate as nuisances various piers and other erections which had been placed in the Hudson River and New York Bay by the defendant, extending out from the New Jersey shore and allegedly authorized by this State. The decision very clearly demonstrated that the jurisdiction ceded to New York under Article III was not that total

and complete jurisdiction typically concommitant with sovereignty. Rather,

"It was to be a police jurisdiction of and over all vessels, ships, boats or craft of every kind that did or might float upon the surface of said waters, and over all the elements and agents or instruments of commerce, while the same were afloat in or upon the waters of said bay and river for quarantine and health purposes, and to secure the observance of all the rules and regulations for the protection of passengers and property, and all fit governmental control designed to secure the interests of trade and commerce in said port of New York and preserve thereupon the public peace." (42 *N. Y.*, at *pages* 299-300)

The holding was that the cession of this special jurisdiction did not encompass the right of New Jersey to develop her own facilities necessary to engage in the ocean commerce. And for like reason New Jersey's sovereign power of taxation within her territorial boundaries was not diminished by the 1834 Compact. *Central R. Co. of New Jersey v. Jersey City,* 70 *N. J. L.* 81 (*Sup. Ct.* 1903), affirmed *per curiam,* 72 *N. J. L.* 311 (*E. & A.* 1905), affirmed 209 *U. S.* 473, 28 *S. Ct.* 592, 52 *L. Ed.* 896 (1908); *Tennant v. State Board of Taxes & Assessments,* 95 *N. J. L.* 465 (*E. & A.* 1921). *Cf. In re Gutkowski's Estate,* 135 *N. J. Eq.* 93 (*Prerog Ct.* 1943) (statute of distribution). In brief, then, the Article III and Article V cessions of jurisdiction merely carved out a portion of that total governmental jurisdiction which the respective states would otherwise have exercised to their territorial boundaries as established in Article I, and envisioned a unilateral control and regulation in the interests of commerce and navigation within particular areas of the waters between the two states. *Central R. Co. of New Jersey v. Jersey City,* 209 *U. S.* 473, 479, 28 *S. Ct.* 592, 52 *L. Ed.* 896, 899 (1908); *Ferguson v. Ross,* 126 *N. Y.* 459, 27 *N. E.* 954 (*Ct. App.* 1891); *Clarke v. Ackerman,* 243 *App. Div.* 446, 278 *N. Y. S.* 75 (*App. Div.* 1935).

We do not determine whether the Article III jurisdiction ceded to New York encompasses an exclusive control over all criminal offenses, and specifically the power to deal with

gambling on the waters between the two states. *State v. Babcock, supra,* and *Ferguson v. Ross, supra,* would indicate an exclusive criminal jurisdiction. The State has not argued otherwise, and we may assume the proposition for the purpose of deciding the point at issue.

The question we deal with is whether the descriptive term "waters of the bay of New York" appearing in Article III was intended by the framers of the Compact as well as the two legislative bodies affirming and ratifying that instrument to encompass waters lying south of the Narrows, extending beyond the territorial boundary to the New Jersey shore in Monmouth County as well as touching Sandy Hook.

The conclusion reached below rebels against the very term of the Compact itself as related to geographic fact, for if the commissioners conceived the Bay of New York as lying south of the Narrows, their efforts in stating an agreement in clear and unambiguous terms did not attain that degree of perfection which we would customarily attribute to so important a document.

The territorial boundaries established by Article I are important as a line of reference. Thus, in the Hudson River-New York Bay area the line runs in a *north-south* plane. It does not continue through the Narrows and into the Atlantic. Rather it continues through the Kill von Kull and Staten Island Sound to Raritan Bay. From Raritan Bay the line proceeds in an *east-west* plane to the main sea off Sandy Hook. (The latter line was more definitely laid out in 1888 through joint state action, of which more hereafter.)

Article III, after investing New York with extra-territorial jurisdiction over the whole of New York Bay and a portion of the Hudson, reiterates again New Jersey's property right coincident with the territorial boundary in this area, as established by Article I, in the following language:

"The state of New Jersey shall have the exclusive right of property in and to the land under water, *lying west of the middle of the bay of New York* * * *." (Emphasis supplied.)

(The New York Court of Appeals thought this language superfluous in view of Article I, but surmised that it was inserted as a caution—*People v. Central R. Co. of New Jersey, supra,* 42 *N. Y.,* at *page* 298.) If the Bay of New York is confined to the area north of the Narrows where the territorial boundary line runs in a north-south plane, there is no ambiguity in the confirmatory language quoted above that the "land under water, lying west of the middle of the bay of New York" belongs to New Jersey. On the other hand, the confirmatory language becomes an incongruity, repugnant alike to geographic fact and territorial boundary, on the hypothesis that the Compact contemplates New York Bay as continuing south of the Narrows to the New Jersey shoreline in Monmouth County. In this area the territorial boundary runs in an east-west plane and New Jersey's property lies *south* of this line and not *west.* Indeed, if a north-south line of reference be imposed through "the middle" of the waters lying south of the Narrows, it is readily observed that if New Jersey has "the exclusive right of property * * * lying west" of this line it might conceivably claim title to lands under water lying seaward of Staten Island.

The decision below raises still a further incongruity in the Compact. By virtue of Article V New Jersey exercises an extra-territorial jurisdiction over a portion of Raritan Bay which extends from Perth Amboy to a line (north-south) running from the lighthouse at "Prince's Bay" (Princess Bay) on Staten Island to "the mouth of Matavan Creek" (Matawan) in Monmouth County. If the Article III jurisdiction of New York extends to all the water south of the Narrows ("to the low-water mark on the westerly or New Jersey side thereof"—Article III) it would clearly conflict with the Article V jurisdiction of New Jersey.

We cannot accept a result which raises more problems than it answers, nor can the framers of the Compact of 1834 be attributed with a bankruptcy in utilizing language which would leave so important a document in a state of sterility. Indeed, the defendants' thesis would nourish rather than

resolve the disputes which had taken place between the two states prior to the Compact.

Significantly, perhaps, the only map that was offered to the court below was one printed by the Coast and Geodetic Survey of the United States Department of Commerce in 1955. (New York Harbor, C. & G. S. No. 369, revised 7/11/55.) The water area immediately north of the Narrows is denominated "Upper Bay" and that below as "Lower Bay." But if we are to interpret the intent of the parties in the now historical setting of 1834, attention is more valuably directed to maps and writings of an earlier period. *Cf. Verhagen v. Platt,* 1 *N. J.* 85, 88 (1948); *Heuer v. Rubin,* 1 *N. J.* 251, 255 (1949). The following summary confirms the conclusion that the framers of the Compact considered the "bay of New York" to be above, rather than below, the Narrows.

A "Description of New-York bay" is contained in *Blunt, The American Coast Pilot* (10*th ed.* 1822), *page* 212:

"York bay is 9 miles long, and 4 broad, and spreads to the southward before New-York. It is formed by the confluence of East and Hudson's rivers, and embosoms several small islands, of which Governor's island (on which are Castle Williams and Fort Columbus) is the principal. It communicates with the ocean through the Narrows, between Staten and Long islands, which are scarcely two miles wide. The passage up to New-York from Sandy-Hook (the point that extends farthest into the sea) is safe, and not above 18 miles in length."

The description of the bay as lying north of the Narrows is reiterated in *Spafford, A Gazetteer of the State of New York* (1824), at *p.* 346:

"New York Bay, spreads to the southward of New-York, or Manhattan Island, and is about 8 miles long, and from 1½ to 5½ broad; having Long-Island on the E., and Staten-Island, and New-Jersey, on the west. In the N. it receives the Hudson; East River, in the NE., from Long-Island Sound; communicates with Newark Bay, through the Kills, on the W. between Staten-Island, Constable's Point, and Bergen Neck; and with the Atlantic Ocean by the Narrows, between Long and Staten-Islands. This Bay embosoms several small islands, as Governor's Island, Bedlow's Island, and Ellis's Island, near the city of New York, on each of which

are fortifications. The waters of this Bay form the Harbor of New-York. From Sandy-Hook Light-House, to the city of New-York, is about 16 miles, and the water is deep enough to float the largest vessels."

Similarly, in *Thompson, The History of Long Island* (1843), at *p.* 27 it is said "The Bay of New York being about 9 miles in length and 5 in breadth, has a communication with the Atlantic through a strait of about a mile broad between Long and Staten Islands." John Disturnell in *A Gazetteer of the State of New York* published in 1842, *p.* 284, confirmed these geographic descriptions of the Bay of New York, but rather than denominate the water area immediately south of the Narrows as the Atlantic Ocean, called it the "Lower Bay" of New-York.

The following early maps confine New York Bay to an area north of the Narrows:

Map of the State of New York, by Amos Lay (1826)

Map of the State of New York, by Augustus Mitchell (1834)

Squire's Map of the State of New York, by Wm. Chapin (1834)

On a "Map of the Country Thirty Miles round the City of New York," by I. H. Eddy and published in 1842, "New York Bay" appears above the Narrows, and the water area below is termed "The Lower Bay." The only exception to this treatment of New York Bay that has come to this court's attention is a "Map of Long Island with the Environs of New York," by J. Calvin Smith in 1836, which denominates the area north of the Narrows as "New York Harbor" and south of the Narrows as "New York Bay." "Sandy Hook Bay" is also named as well as "Raritan Bay" and it does not appear that the cartographer considered these waters as part of New York Bay.

An earlier map made under the auspices of the Federal Government by the Coast Survey confines New York Bay above the Narrows. Map of New York Bay and Harbor, Coast Survey Map 120 (1844–1845). From 1866 (Coast

Chart No. 20, New York Bay and Harbor–1866) to the present day the Coast and Geodetic Survey has used the terms "Upper Bay" and "Lower Bay" in demonstrating the areas in question. A letter written to defendants' counsel in the court below which has been submitted to this court expresses an opinion of that office which is worthy of note:

"In summary then, it can be stated that none of the published charts of the Coast Survey have ever designated the area of 'Lower Bay' as 'New York Bay' or 'Bay of New York,' although there are references in the Annual Report of the Coast Survey for the year 1857 that New York Bay could have been thought of as also encompassing the lower bay; that in the early charts, the name is confined to the area north of The Narrows, and in the later charts the terminology 'Upper Bay' and 'Lower Bay' is used, without the appendage 'New York'; and that there is no uniformity of treatment on non-Coast Survey maps and publications, the majority indicating the name 'New-York Bay' to be applied to the area north of The Narrows."

Our own study conclusively indicates that these earlier writers and cartographers, with but one exception, confined New York Bay to the area above the Narrows and described the Narrows as the connecting link between the Bay and the Atlantic Ocean, although later works spoke in terms of an "Upper Bay" and a "Lower Bay."

There are other significant observations to be made. In 1886 and 1887 joint state action was taken to locate and mark out by proper buoys a more definitive territorial boundary line in Raritan Bay. *Laws of N. J.* 1886, *p.* 418; *Laws of N. Y.* 1887, *c.* 69. This endeavor resulted in a further Compact (*L.* 1888, *c.* 55) which in essence supplemented Article I of the 1834 Compact. The line commences in the center of the southerly entrance to Staten Island Sound and continues through Raritan Bay to "the main sea." *R. S.* 52:28–18, 19. An official map was made and became part of the Compact. *R. S.* 52:28–21. Although "Raritan Bay" appears on the map as well as "Sandy Hook Bay," the term "New York Bay" does not appear. If the latter term in the 1834 Compact had the geographical

extent argued for by defendants, it is not unreasonable to believe that the commissioners who authored the 1888 Compact would have been very careful to label that area south of the Narrows as New York Bay. Neither the map nor the commissioners' report nor the minutes of their proceedings suggest that the boundary line through Raritan Bay to the Atlantic Ocean fell within waters of New York Bay. The inferences are all to the contrary. See *Boundary Question—New Jersey and New York, Report and Proceedings of the New Jersey Boundary Commission* (1887) (State Library).

In 1900 the Legislature of New Jersey enacted a law which, if defendants' position be correct, constituted a gross breach of the 1834 Compact. *L.* 1900, *c.* 69, *sec.* 4, required certain vessels coming within Raritan Bay or Sandy Hook Bay south of a straight line from "Ward's Point" (the southerly tip of Staten Island) to the "northerly extremity of Sandy Hook" to anchor for inspection by the Perth Amboy port health officer. (The instant arrests took place well within this area.) This type of regulatory control was of the very essence of the extra-territorial jurisdiction ceded to New York in Article III of the 1834 Compact. See *Art. III, par. 2, supra.*

We conclude, then, that the Compact of 1834 treats the "bay of New York" as that body of water lying north of the Narrows; that the Article III jurisdiction of New York over the waters of the "bay of New York" is so confined; that in all the waters lying south of the Narrows between New York and New Jersey and easterly of a line from Princess Bay Lighthouse to Matawan Creek neither state enjoys an extra-territorial jurisdiction of the type provided for in Articles III and V. In this area boundary is total sovereignty.

The Compact of 1921 creating the Port of New York Authority, *R. S.* 32:1-1 *et seq.,* provided that "the territorial or boundary lines established by the agreement of 1834, or the jurisdiction of the two states established thereby, shall not be changed except as herein specifically modified."

*Art.* XX; *R. S.* 32:1–21. Research has not revealed any modification which would affect the issue *sub judice.*

The judgment is reversed and the indictment is reinstated.

*For reversal*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, BURLING, JACOBS and WEINTRAUB—6.

*For affirmance*—Justice WACHENFELD—1.