### STATE v. BABCOCK AND BABCOCK.

1. An indictment will lie for a nuisance in obstructing Hudson river, by placing vessels and wrecks on the shore between the high and low water lines, but not for placing them below the low water line.
2. The exclusive jurisdiction in and over the waters of the Hudson, and in and over the land covered by those waters, is in the state of New York, and not in the state of New Jersey.

The indictment in this case was found in the Court of Oyer and Terminer of the county of Hudson, and removed by *certiorari* into the Supreme Court. It was taken down for trial before the Circuit Court of said county, and the jury returned a general verdict of guilty, together with a special state of the case.

Argued before the CHIEF JUSTICE and Justices HAINES, VAN DYKE, and ELMER.

For the State, *Isaac W. Scudder.*

For defendants, *S. B. Ransom.*

The opinion of the court was delivered by

ELMER, J.   By the compact between the states of New Jersey and New York, ratified by the legislatures of the two states, and approved by congress, *Nix. Dig.* 822,* the state of New York has exclusive jurisdiction of and over all the waters of Hudson river, and of and over the lands covered by the said waters, to the low water mark on the New Jersey shore; and the state of New Jersey has the exclusive right of property in and to the land under the water lying west of the middle of the river, and exclusive jurisdiction of and over the wharves, docks, and improvements made and to be made on the Jersey shore, and on vessels aground on said shore, or fastened to any such wharf or dock, except as to quarantine regulations and the exclusive right of regulating the fisheries on the westerly side of the middle of the river.   The waters of the Hudson, although exclusively within the jurisdiction of New York, are a common highway for all the citizens of the United States.   Any obstruction to that highway, placed on the shore above low water mark, which shore remains exclusively within the jurisdiction of New Jersey, either by means of vessels, logs, stones, or other temporary obstructions placed there, or by means of a wharf or other improvements which are injurious to the navigation, is of course indictable in this state; while obstructions below the low water mark where not only the water but the land under the water are exclusively, except as to the fisheries, within the jurisdiction of New York, can only be punished by proceedings in the courts of that state or of the United States.   If by docks, as used in the compact, is meant, as I suppose according to the American usage, the spaces between the wharves, the land covered by the water within such docks is also within the jurisdiction of this state, and obstructions placed therein, which are injurious to the navigation, may be indicted in our courts.

The indictment in the case before us charges that the defendants obstructed the free navigation of the river, by placing, sinking, and lodging in said river, and upon the

* *Rev., p.* 1178.

State v. Babcock.

shore of this state in said river, certain ships, schooners, boats, and other vessels ; and it is found as a fact by the jury, according to the special case returned to us with a general verdict of guilty, that the defendants had, within the time specified in the indictment, placed and procured to be placed vessels and wrecks of vessels, both above and below the low water line, which were an interruption to the free navigation of the river. Other facts are also found by the jury, which perhaps were meant to show that obstructions were placed in a dock ; but the indictment does not charge that any obstructions were placed in a dock, nor do the facts stated enable us judicially to determine that such was the case. What is a dock, I suppose is a mixed question of fact and law.

Had the special case explicitly stated that the obstructions placed on the shore, that is on the land covered by the tide between the ordinary high and low water lines, were obstructions to the navigation of the river, and did it sufficiently appear that the two defendants had acted jointly in placing and keeping them there, I should be of opinion that judgment ought to be pronounced for the state. As the case appears, it will be the only safe course to send down the case for a new trial, that these two questions may be distinctly submitted to the jury.

It has been earnestly insisted that the safety of property holders on the Jersey shore requires us to hold that obstructions in the river, outside of the low water line, if injurious to the navigation of vessels coming to that shore, are offences against our laws and indictable in our courts. But apprehensions of this kind, which are probably altogether imaginary, will not justify us in departing from the plain meaning of the compact. Although, for some purposes, New Jersey is bounded by the middle of the Hudson river, and the state owns the land under the water to that extent, exclusive jurisdiction, not only over the water, but over the land to the low water line on the Jersey shore, is in plain and unmistakable language, granted to, or rather acknowl-

State v. Babcock.

edged to belong to the state of New York. There is no reason to doubt that the tribunals of that state, which have a common interest in preventing all obstructions to the navigation of the waters surrounding their most important city, will not only punish all crimes against our citizens or their own, while in or upon those waters, but will also adequately punish all interference with the navigation. The case does not materially differ from a line between two states on the land which happens to be the scene of a busy population, where a manufactory near to that line, in one state, may be a nuisance to the citizens of the other, whose redress will have to be obtained from the tribunals of the state in which the nuisance is situate.

As persons not acquainted with the circumstances of the dispute between the states of New Jersey and New York, in regard to their respective rights in the river and bay separating them, have sometimes complained of the compact agreed upon in the year 1833, after a long and troublesome controversy, and after the failure of two previous attempts to terminate it by agreement, as having conceded too much to New York, it may be proper to take this opportunity of explaining the obvious motives which induced the commissioners and the legislature of this state to consent to the terms finally adopted.

The territories now forming the states of New York and New Jersey, including by name Hudson river, were granted originally by king Charles the second to his brother, the Duke of York, afterwards James the second. The duke granted to Lord Berkeley and Sir George Carteret the territory now the state of New Jersey, and described it as " all that tract of land adjacent to New England, and being to the westward of Long Island and Manhattan Island, and bounded on the east part by the main sea and part by Hudson river, and hath upon the west Delaware bay or river." Between the date of this grant and the Revolution, the charters of New York city, and the proceedings of its authorities, showed that it had always been claimed that the whole

State v. Babcock.

·of Hudson river, up to the low water mark on the westerly shore, belonged to that state. But it was only after the Revolution, and when it appeared that, if this claim was acquiesced in, all the wharves and improvements on the Jersey shore would be subject to the control of New York, that New Jersey claimed that, by conquest from the crown, the right of New Jersey was extended to the middle of the river. This led to the appointment of commissioners by the two states to settle the conflicting claims in 1807, and again in 1827, without success.

In the meantime, Judge Washington had decided that the grant to New Jersey limited its territory to the eastern shore of the Delaware river and bay, a decision acknowledged by this court to be correct. *State* v. *Davis,* 1 *Dutcher* 386. And, which was still more adverse to the claim of this state in reference to the waters of the Hudson, the Supreme Court of the United States laid down the doctrine, that " when a great river is the boundary between two nations or states, if the original property is in neither, and there be no convention respecting it, each holds to the middle of the stream. But when, as in this case, one state is the original proprietor, and grants the territory on one side only, it retains the river within its own domain, and the newly created state ·extends to the river only ;" and upon this principle they held that the Ohio river was exclusively within the territorial limits of Kentucky, and that Indiana had no jurisdiction ·over or right to the river. *Handley's Lessee* v. *Anthony,* 5 *Wheat.* 374.

When the commissioners of New Jersey and New York again met, in 1833, and it was found that those of the latter state appeared to be desirous of arranging the dispute upon fair and liberal terms, but deemed it indispensable that their great commercial emporium should have the exclusive control of the police on the surrounding waters, and full power to establish such quarantine regulations as should be found necessary, the commissioners of this state deemed it wise to .secure the exclusive property in the soil to the middle of the

river, and exclusive jurisdiction over the wharves, docks, and other improvements made or to be made on the Jersey shore, and of the vessels fastened thereto, and the right to regulate the adjacent fisheries, leaving to New York, which was thought to be quite as much a burthen as a privilege, the exclusive jurisdiction over the offences in or upon the waters or the land covered by the water outside of the low water mark. As it was thought possible that the time might come when Perth Amboy should be an important city, like exclusive jurisdiction over the adjacent waters to low water mark on Staten Island was secured to this state. Nothing has since occurred to make the propriety of this arrangement doubtful; on the contrary, there is every reason to believe that it has secured important rights to this state, which otherwise might have been lost.

In further elucidation of this subject, it is to be noticed that the river Delaware was never within the jurisdiction either of this state or Pennsylvania until, by the Revolution, the rights of the crown were extinguished, and each state then held to the middle. Under these circumstances, the agreement between the two states, adopted in 1783, *Nix. Dig.* 824,* provided that the two states should have concurrent jurisdiction in and upon the water of that river. Of so little importance, however, was this regulation, that it was not until so lately as 1856,† that any law of this state was passed providing for the punishment of offences committed on the river.

A new trial ordered.

*Rev., p. 1181.  †P. L., 1856, p. 242.