BOARD OF HEALTH OF THE TOWNSHIP OF WEEHAWKEN, IN THE COUNTY OF HUDSON, PLAINTIFF-RESPONDENT, v. THE NEW YORK CENTRAL RAILROAD COMPANY, DEFENDANT.

(Appeal of Alfred C. Tanner)

BOARD OF HEALTH OF THE TOWNSHIP OF WEEHAWKEN, IN THE COUNTY OF HUDSON, PLAINTIFF-RESPONDENT, v. THE NEW YORK CENTRAL RAILROAD COMPANY, DEFENDANT.

(Appeal of Fred Charles Hill)

Argued May 12, 1952—Decided June 26, 1952.

286

*Mr. Joseph A. Davis* argued the cause for the appellants.

*Mr. James Rosen* argued the cause for the respondent.

The opinion of the court was delivered by

JACOBS, J.   The Municipal Court of the Township of Weehawken adjudged the appellants Alfred C. Tanner and Fred Charles Hill guilty of contempt for their refusal in open court to answer questions as witnesses; they appealed to the Appellate Division and the causes have been certified by this court on its own motion.

The Board of Health of the Township of Weehawken caused the filing of complaints in the municipal court charging the defendant New York Central Railroad Company with viola-

tion of Weehawken's air pollution ordinance. The jurisdiction of the municipal court to entertain these complaints is sustained in the companion case of *Board of Health of the Township of Weehawken v. New York Central Railroad Company,* 10 *N. J.* 294 (1952). In the course of the proceedings in the municipal court, the board served subpoenas *duces tecum* upon Alfred C. Tanner and Fred Charles Hill, employees of the railroad. Tanner and Hill appeared in court and were duly sworn as witnesses. After answering several questions Tanner declined to answer a question as to whether he was "familiar with the tunnel which starts at Weehawken and ends in North Bergen." In response to the court's inquiry as to why he declined to answer he said "On the advice of my counsel." Thereupon the railroad's counsel stated that he had advised the witness not to answer and moved to terminate the interrogation on the ground that the witness could invoke the privilege against self-incrimination on behalf of his employer, the railroad corporation. The motion was not granted and the interrogation of the witness continued with many refusals to answer questions on the advice of counsel. The interrogation of Hill followed the same course. The court reserved decision as to whether the witnesses were guilty of contempt, and requested briefs. At a later session the court announced its conclusion that they should be directed to answer and then addressed individual questions in open court to Tanner and Hill. They refused to answer on the advice of counsel and were immediately adjudged in contempt and fined $200 each.

## I

The first point advanced by the appellants in support of their appeal is that a corporate defendant in a criminal proceeding may, through its employee witnesses, claim the benefit of the privilege against self-incrimination; they concede that as individuals they were in no danger of incrimination and did not as such assert the privilege. We shall

meet this point directly, passing issues as to whether the proceeding was criminal in nature or the evidence sought incriminating (*cf. Board of Health of Township of Wee-hawken v. New York Central Railroad Company, supra*) and whether the manner in which the refusals to answer were brought about was proper. See *Vineland v. Maretti,* 93 *N. J. Eq.* 513, 521 (*Ch.* 1922); *State v. Mohr,* 99 *N. J. L.* 124, 129 (*E. & A.* 1923).

Dean Wigmore has extensively reviewed the history, policy and limits of the privilege against self-incrimination. 8 *Wigmore, Evidence* (*3d ed.* 1940), *pp.* 276, 304, 342. See also *Morgan, The Privilege Against Self-Incrimination,* 34 *Minn. L. Rev.* 1 (1949). He points out that almost all courts have held that the privilege may not be invoked by a corporation; he attributes this result largely to the fact that the sentiment of fundamental fairness upon which the privilege is partially based "applies only between man and man." More recently the United States Supreme Court similarly stressed that the privilege is essentially a personal one, applying only to natural individuals and growing out of our high concepts of the dignity of all human beings. *United States of America v. White,* 322 *U. S.* 694, 698, 64 *S. Ct.* 1248, 88 *L. Ed.* 1542, 1546 (1944). Citing the leading cases of *Hale v. Henkel,* 201 *U. S.* 43, 26 *S. Ct.* 370, 50 *L. Ed.* 652 (1906), and *Wilson v. United States,* 221 *U. S.* 361, 31 *S. Ct.* 538, 55 *L. Ed.* 771 (1911) the Supreme Court stated comprehensively that the privilege "cannot be utilized by or on behalf of any organization such as a corporation."

Unlike the Federal Constitution (5th Amendment) our State Constitution contains no express provision embodying the privilege against self-incrimination. *In re Vince,* 2 *N. J.* 443, 449 (1949). However, our courts have long recognized that at common law "every individual is clothed for his own protection" with the privilege. See *State v. Zdanowicz,* 69 *N. J. L.* 619, 622 (*E. & A.* 1903); *Fries v. Brugler,* 12 *N. J. L.* 79, 82 (*Sup. Ct.* 1830). *Cf. State v. Auld,* 2 *N. J.* 426, 436 (1949); *State v. Alexander,* 7 *N. J.*

585, 591 (1951). Our Legislature has codified this common law rule in *R. S.* 2:97–7 which reads as follows:

"Personal privilege generally. No witness shall be compelled to answer any question if the answer will expose him to a criminal prosecution or penalty or to a forfeiture of his estate."

See *N. J. S.* 2A:81–5. Nowhere in the statute or our cases is there any suggestion that the privilege may be availed of by a corporation or other artificial entity; on the contrary, their language points directly to the confinement of the privilege to natural individuals. As has already been indicated, the primary reasons advanced in support of the privilege are wholly inapplicable to corporations and while they may be sufficient to warrant, despite recurrent attacks (Knox, *Self Incrimination,* 74 *U. of Pa. L. Rev.* 139, 148 (1925)), its sympathetic retention and observance (*Wigmore, supra,* at *p.* 310) they forcefully negate its extension to artificial entities. See *United States v. White, supra.* We are satisfied that in the instant matter the railroad corporation could not claim the benefit of the privilege and that the deliberate refusal of its employees to answer the questions addressed to them was without basis and constituted contempt *in facie curiae.*

## II

The second point advanced by the appellants is that the municipal court was without "power to summarily punish for contempt *in facie curiae*"; we consider this to be without merit. The framers of our 1947 Constitution declared that the judicial power shall be vested in a Supreme Court, a Superior Court, County Courts and inferior courts of limited jurisdiction, and pursuant to their recommendation (1 *Const. Conv.* 1947, *p.* 847) the Legislature in 1948 enabled the replacement of pre-existing local police courts by new municipal courts. *N. J. S. A.* 2:8A–13. These courts are vested by the governing statute with certain civil and criminal

jurisdiction (*N. J. S. A.* 2:8A–27, 2:8A–28, 2:8A–47) and their administration and practice and procedure are subject to rules of the Supreme Court which have been promulgated in detail. *N. J. S. A.* 2:8A–30; *Const.* 1947, *Art. VI, Sec. II, par.* 3. As do all other courts, they maintain adequate records under general supervision of the Administrative Director (*Rule* 8:13), and they operate under rules of conduct applicable to their superior courts; County Court judges are *ex-officio* judges of the municipal courts and Superior Court judges may be assigned thereto temporarily. *N. J. S. A.* 2:8A–38. Our municipal courts are most important because they are closest to the people and under the guidance of the governing statute and the Supreme Court's rules they are coming to exercise a significant part of the judicial power with dignified effectiveness. To deny them the "right of self-preservation" (*Marshall v. Gordon,* 243 *U. S.* 521, 544, 37 *S. Ct.* 448, 61 *L. Ed.* 881, 887 (1917)) upon which rests the implied power of courts generally to punish for contempt *in facie curiae* (*cf. Rule* 8:9–1) would largely nullify their status and ability to function properly as an essential part of our judicial structure. See Frankfurter and Landis, *Power to Regulate Contempts,* 37 *Harv. L. Rev.* 1010, 1022 (1924). It may be noted that Sir John Fox' attack on Justice Wilmot's famous opinion in *Almon's Case* is confined to that portion which asserts an immemorial power in courts to punish summarily contempt committed out of court; he does not address any question to that portion which recognized as "a necessary incident to any court of justice" the right to punish summarily for contempt committed in the face of the court. See *Fox, The History of Contempt of Court* (1927), *pp.* 7, 52.

▮ Apart from the foregoing there is ample express legislative authority recognizing the contempt power in municipal courts. *N. J. S. A.* 2:8A–28 vests each municipal court with the pertinent power and jurisdiction theretofore exercised by any justice of the peace, police justice, police magistrate or recorder, and *N. J. S. A.* 2:8A–30 provides that subject to

Supreme Court rules the practice of the municipal courts shall be substantially as provided by *R. S.* 2:220–32 to *R. S.* 2:220–55. In *R. S.* 2:220–49 the Legislature provided that the practice of the Court of Quarter Sessions and Special Sessions "including the power to punish for contempt of court" shall apply to the recorder's court. See *Croasdale v. Court of Quarter Sessions,* 88 *N. J. L.* 506 (*Sup. Ct.* 1916), affirmed 89 *N. J. L.* 711 (*E. & A.* 1916)), where it was held that the Court of Quarter Sessions had power to punish summarily for contempt, and *In re Selick J. Mindes,* 88 *N. J. L.* 117 (*Sup. Ct.* 1915) where the court recognized and sustained the summary exercise of the contempt power by a municipal criminal court. In *R. S.* 2:15–3 the Legislature has provided that summary conviction for contempt in the Superior Court, County Court, "or any inferior court" shall be reviewable in the Appellate Division upon the law and the facts. In the light of the cited enactments it may hardly be doubted that the Legislature has contemplated that every new municipal court created pursuant to *N. J. S. A.* 2:8A–13 would be vested with full power to punish summarily, in appropriate instances, for contempt of its authority. See *N. J. S.* 2A:10–7.

The appellants urge that notwithstanding all of the above the municipal courts are not to be deemed courts of record and may not constitutionally be empowered to punish summarily for contempt. *Cf. Re Peter Kerrigan,* 33 *N. J. L.* 344 (*Sup. Ct.* 1869); *Rhinehart v. Lance,* 43 *N. J. L.* 311 (*Sup. Ct.* 1881). It is true that the cases abound with the assertion that at common law the summary contempt power was confined to courts of record, but none of them supports the suggestion that this was in any sense a constitutional limitation against the development or creation of new inferior courts of record; indeed, the authorities are expressly to the contrary. See *Croasdale v. Court of Quarter Sessions, supra; Rhinehart v. Lance, supra,* at *p.* 320. Pollack and Maitland point out that the "distinction between 'courts of record' and courts that are 'not of record' takes us back to

early times when the king asserts that his own word as to all that has taken place in his presence is uncontestable," 2 *History of English Law, p.* 669 (1923). And Holdsworth, after referring to Coke's attempt to confine the power to fine or imprison to common law courts of record, states:

"Thus for political reasons the distinction gained an importance for which, historically, there was no warrant; and though these political reasons for its importance disappeared after the seventeenth century, it remained as technical distinction between courts. It still exists; but at the present day it is of little practical importance."

5 *Holdsworth's History of English Law* (1924), *p.* 160. *Cf. Hall, Selected Writings of Benjamin Nathan Cardozo* (1947), *p.* 264. In the light of the modern judicial structure created by the Constitution of 1947 and implemented by acts of our Legislature and rules of our Supreme Court, the distinction would appear to have no present day purpose and might well be discarded; in any event, if it is to be perpetuated, we are satisfied that the new municipal courts are to be deemed courts of record (*cf.* Shaw, C. J., in *Ex Parte Gladhill,* 8 *Metc.* 168, 170, 49 *Mass.* 168, 170 (*Sup. Jud. Ct.* 1844)), and at least one of its predecessor courts was expressly described as such by the Legislature. See *R. S.* 2:218–4.

In *Re Peter Kerrigan* and *Rhinehart v. Lance, supra,* relied upon heavily by the appellants, the former Supreme Court, with doubtful precedent (*cf. Ewing, Justice of the Peace in New Jersey* (1805), *p.* 10), did express the view that justices of the peace and recorders, as then constituted, were not courts of record and had no contempt power; however, a reading of the opinions discloses underlying considerations which are no longer applicable. Thus in *Re Peter Kerrigan* the court noted that the contempt power was great "and its exercise without review"; today there is full review in the Appellate Division, both on law and facts (*R. S.* 2:15–3; *N. J. S.* 2A:10–3; *Rule* 1:2–18A), and that court has not hesitated to upset improper contempt convictions. See *State v. Illario,* 10 *N. J. Super.* 475 (*App.*

*Div.* 1950) ; *cf. Marino v. Cocuzza,* 14 *N. J. Super.* 16 (*App. Div.* 1951) ; *Zimmerman v. Zimmerman,* 12 *N. J. Super.* 61 (*App. Div.* 1950). And in *Rhinehart v. Lance, supra,* the court stated that "the power to summarily punish contempts by fine and imprisonment must be assigned to such of our courts as, in constitution and jurisdiction, are modeled after the courts which possessed the power at common law" and that newly created inferior courts ought not have the power "in the absence of a clear expression of the legislative intent to confer such a power upon it." It might well be suggested that even under the foregoing views there would be no impairment whatever of the force of the conclusion that our modern municipal courts ought be and have been vested with summary contempt power to be exercised in appropriate instances, though cautiously and sparingly. See *State v. Illario, supra.*

## III

██ Finally, the appellants contend (1) that the magistrate who imposed the convictions was disqualified under *Rule* 8:9-2 and (2) that their sentences were too severe. Neither point has merit. The contempt was *in facie curiae* and was properly dealt with by the magistrate under *Rule* 8:9-1. The sentences were fines of $200 each without any prison terms; they were entirely appropriate under the admitted circumstances.

Affirmed.

*For affirmance*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, WACHENFELD, BURLING, JACOBS and BRENNAN—7.

*For reversal*—None.