687 A.2d 804

STATE of New Jersey, Plaintiff,

v.

Jorge E. GARCIA, Defendant.

Municipal Court, City of Palmyra,
Burlington County,
New Jersey.

Decided Sept. 17, 1996.

*R. Louis Gallagher, II,* Municipal Prosecutor, for State of New Jersey.

*Joseph A. Diorio,* for defendant Jorge E. Garcia.

J.F. KEARNEY, 3rd, J.M.C.

This matter is before the court on a motion to dismiss for lack of jurisdiction. Although the issue was briefed and argued at the

close of the State's case, decision of the matter was held until after completion of the trial pursuant to *R.* 3:10–4, applicable under *R.* 7:4–2(e). The trial resulted in findings of guilty against Mr. Garcia on charges of careless driving, in violation of *N.J.S.A.* 39:4–97, and leaving the scene of an accident in violation of *N.J.S.A.* 39:4–129, upon which fines and costs were imposed.

The basis of the dismissal motion is that the offenses involved were shown by the evidence to have occurred entirely on the Pennsylvania side of the Tacony–Palmyra Bridge. The jurisdictional question involved is entirely territorial.[1]

Defendant contends that, since the offenses occurred on a part of the bridge fairly characterized as being in Pennsylvania, and because the stop during which the summonses issued occurred beyond the bridge, within the City of Philadelphia, Pa., the courts of Pennsylvania, and not this court, have jurisdiction.

The State contends that jurisdiction is conferred under *State v. Holden,* 46 *N.J.* 361, 217 *A.*2d 132 (1966) and *N.J.S.A.* 32:4–6, part of the interstate compact creating the Delaware River Port Authority (D.R.P.A., D.R.P.A. Compact), and specifically by *N.J.S.A.* 27:19–36.3, which authorizes and empowers the Burlington County Bridge Commission Police; and/or by *N.J.S.A.* 52:28–33.

For the reasons stated herein, the State's first two contentions are incorrect. *Holden, supra,* is distinguished; the D.R.P.A. Compact and *N.J.S.A.* 32:4–6 are inapplicable; and *N.J.S.A.* 27:19–36.3 does not, by its terms, grant jurisdiction. The State's last contention as to *N.J.S.A.* 52:28–33 does apply and, construed together with *N.J.S.A.* 52:28–25 and *N.J.S.A.* 2B:12–16(a), provides a firm basis for the exercise of jurisdiction.

## I.

The facts necessary to decision of this issue, developed at trial, are these. While acts of Jorge Garcia constituting the offense of

---

1. The types of offenses involved are clearly within the court's subject matter jurisdiction. *N.J.S.A.* 2B:12–17(b).

careless driving can arguably be viewed as having taken place within New Jersey, the accident and all of the acts constituting the elements of the offense of leaving the scene of an accident occurred on the northwesterly side, beyond both the draw structure and midpoint, of the Tacony–Palmyra Bridge. They therefore occurred, for purposes of this analysis, outside of the municipality and beyond the New Jersey–Pennsylvania border. The offenses were completed on the portion of the bridge which is over the waters of the Delaware River, and not that portion which extends over dry land in Philadelphia, Pa. Mr. Garcia was followed off the bridge, into Philadelphia, where a stop was effected on a city street.

The court takes judicial notice of these additional facts for purposes of this decision. *N.J.R.Evid.* 201. The Burlington County Bridge Commission owns and operates the Tacony–Palmyra Bridge, a major interstate crossing connecting the nation's fifth largest city with southern New Jersey, in one of the nation's most densely populated multistate metropolitan areas. It is one of only four vehicular bridges crossing the Delaware River from Philadelphia itself. It is on a principal route connecting that city and Atlantic City, and other New Jersey shore resorts. It is therefore subject to heavy traffic. In 1995, for example, there were 17,947,035 vehicle crossings.

The bridge extends from lands within Palmyra. The relevant border of Palmyra, according to its 1894 Charter, is the shoreline of the River.[2] The New Jersey–Pennsylvania border off Palmyra is the "thalweg", defined as the main sailing channel of the Delaware River in 1783 as changed only by natural and gradual

---

2. "... along the middle of said Morgan Avenue to the Delaware River, and thence southwesterly along said Delaware River...." *L.*1894, *c.* LIX. A number of the Charter's courses mention the "middle" of streets, and, significantly, the "middle" of the Pennsauken Creek. *Id.* If the drafters intended the boundary to be the "middle" of the river, or of its sailing channel, in light of this they would have said so, rather than using the phrases "to" and "along said Delaware River."

processes. *Atty. Gen. F.O.* 1956, No. 22. The "thalweg" is not necessarily the modern shipping channel, which is dredged; its position now constrained by the bridge's draw-structure. The precise border is, in any event, imprecise and difficult of ascertainment without substantial historical research and a survey. *Cf. State v. Carlaftes,* 24 *N.J.* 451, 132 *A.*2d 515 (1957) (border at Sandy Hook Bay).

## II.

New Jersey municipal courts are statutory courts of limited jurisdiction. In the 1947 Constitution, the Legislature was empowered to create such courts, and to prescribe their jurisdictional limits. *N.J.Const.* Art. 6, § 1, cl. 1. It originally did so in *N.J.S.A.* 2A:8–1 to 2A:8–55 (repealed), and subsequently enacted *N.J.S.A.* 2B:12–1 to 2B:12–31 (*L.*1993, *c.*293). The basic territorial limits of the jurisdiction of a municipal court are as follows:

A municipal court of a single municipality shall have jurisdiction over cases arising within the territory of that municipality.... The territory of a municipality includes any premises or property located partly in and partly outside of the municipality.

*N.J.S.A.* 2B:12–16(a).

■ Because a municipal court has limited jurisdiction, it is obligated to assess whether or not it has the power to act in a particular matter before it. The authority of the court to adjudicate disputes must be found in legislative grants of jurisdiction. *State v. Casalino,* 262 *N.J.Super.* 166, 168, 620 *A.*2d 449 (App.Div. 1993); *cf. Dumansky v. U.S.,* 486 *F.Supp.* 1078, 1082 (D.N.J.1980).

This is especially true in this case, wherein the court is called upon to exercise its power not only outside usually understood municipal boundaries, but also as to acts which occurred wholly outside the border of the state empowering it. Due respect must be given principles of comity and of state sovereignty within our Federal system. *Cf. World–Wide Volkswagen v. Woodson,* 444 *U.S.* 286, 292, 100 *S.Ct.* 559, 564, 62 *L.Ed.*2d 490 (1980).

Without a firm bedrock of jurisdiction, the court is without power to adjudicate the matter before it. *Cf. Carlsberg Res. Corp. v. Cambria S & L,* 554 *F.*2d 1254, 1256 (3d Cir.1977).

### III.

The State's reliance on *State v. Holden, supra,* is misplaced. The Supreme Court in that case found its basis for the exercise of municipal court jurisdiction in the D.R.P.A. Compact, *N.J.S.A.* 32:3–1 to 32:3–18, 36 *Pa.S.* § 3503 *et seq.,* an interstate agreement made by Pennsylvania and New Jersey, enacted into the law of both States, and approved by Congress, Res. 26, Jun. 14, 1932, *c.* 258, 47 *Stat.* 308,[3] as required by *U.S. Const.* Art. 1, § 10, cl. 3.

■ That compact specifically provides that an offender on a D.R.P.A. bridge may be taken before a "proper" judicial officer of either New Jersey or Pennsylvania ". . . without respect to the portion of the bridge . . . upon . . . which such offense may have been committed . . . or such offender arrested, and . . . such judicial officer shall have the power and authority to punish such offender. . . ." *N.J.S.A.* 32:4–6, 36 *Pa.S.* § 3504.1.

This grant of jurisdiction is inapplicable to the instant case because the Tacony–Palmyra Bridge, although located in the Port District, *N.J.S.A.* 32:3–13.23, is neither owned nor operated by the D.R.P.A. and is not subject to the D.R.P.A. Compact.[4] *N.J.S.A.*

3. The D.R.P.A. was originally the Delaware River Joint Commission. The compact has been amended by the states and resubmitted for approval by Congress. *See P.L.* 573, July 17, 1952, *c.* 921, 66 *Stat.* 738; *P.L.* 574, Jul. 17, 1952, *c.* 922, 66 *Stat.* 747; *P.L.* 88–320, Jun. 13, 1964, 78 *Stat.* 215.

4. While the D.R.P.A. was given authority to acquire the Tacony–Palmyra Bridge, *N.J.S.A.* 32:3–13, it has not done so. The Delaware River Joint Toll Bridge Commission, another entity created by interstate compact, (*N.J.S.A.* 32:8–1 *et seq.;* 36 *Pa.S.* § 3401 *et seq.; P.L.* 411, Aug. 30, 1935, § 9, 49 *Stat.* 1058) also was given authority to acquire the Tacony–Palmyra Bridge. *N.J.S.A.* 32:8–11. It also has not done so.

32:4–6 is, thus, inapplicable to the Tacony–Palmyra Bridge; and *Holden, supra,* being principally based thereon, is not controlling.

The Tacony–Palmyra Bridge is owned by the Burlington County Bridge Commission (B.C.B.C.), a corporate body politic appointed by the Burlington County Board of Chosen Freeholders pursuant to authority granted by New Jersey alone. *N.J.S.A.* 27:19–26 to 27:19–45. Unlike other agencies operating interstate bridges,[5] the B.C.B.C. is not created by an interstate compact enacted into law by compacting states and approved by Congress. It is said to be the only interstate bridge commission operated by a county in the nation.

The New Jersey Legislature authorized the B.C.B.C. to create and operate a police force, and confers on the police thereby authorized the power to arrest, or to issue summonses, for offenses "... committed within the jurisdiction of this State ..." on its bridges, their approaches, or other B.C.B.C. property. *N.J.S.A.* 27:19–36.3. This statute neither defines nor refers to what *is* within this state's jurisdiction, and does not, therefore, answer the question posed by the instant case.

## IV.

I thus turn to the source of a jurisdictional basis over this case. In 1783 New Jersey and Pennsylvania entered into a Compact settling various issues between them over their respective rights in the Delaware River, including navigation, fisheries, and jurisdiction. The Compact, negotiated by commissioners, was ratified and enacted into law by the legislatures of the respective states, New Jersey on May 27, 1783, *L.* 1783 (Paterson 47), *N.J.S.A.* 52:28–23

---

5. *See e.g.* D.R.P.A., *supra,* in text; Port Authority of New York and New Jersey (*N.J.S.A.* 32:1–1 to 32:1–176; *McK.Unconsol.Laws* (N.Y.) § 6401 *et seq.,* Res. 17, Aug. 23, 1921, 42 *Stat.* 174); Delaware River and Bay Authority (*N.J.S.A.* 32:11E–1 to 32:11E–12 *et seq.;* 17 *Del.C.* § 1701 *et seq., P.L.* 87–678, Sep. 20, 1962, 76 *Stat.* 560.)

to 52:28–28; and Pennsylvania on September 20, 1783. 71 *Pa.S.* § 1801 *et seq.*[6]

---

6. This Compact predates the Constitution, and *U.S. Const.* Art. 1, § 10, *cl.* 3, prohibiting states from entering into agreements or compacts without consent of Congress. It was not expressly consented to by either the present or the confederal Congress.

The Articles of Confederation also required consent of Congress to the entry by two or more States into any "treaty, confederation or alliance," and to the entry into "any conference, agreement, alliance or treaty with any king, prince or state." *Art. of Confederation* (1778), Art. VI. It also provided that "the United States in Congress assembled shall ... be the last resort on appeal in all disputes ... between ... states ..." and set forth a method of adjudicating such disputes, *Art. of Confederation* (1778), Art. IX, said to have resulted in the world's first submission by sovereign states to a formal mechanism of juridical dispute resolution.

Boundary and jurisdictional disputes were common during this period, but only one was submitted to the Art. IX procedure: that of Pennsylvania and Connecticut over the Wyoming Valley, the commission to resolve which met in Trenton. Many others were amicably resolved by compacts, but none submitted to the confederal authority for Art. VI consent. It was probably believed unnecessary to submit such agreements for consent because of notions of state sovereignty and independence. Present-day interstate boundary and compact interpretation disputes are within the U.S. Supreme Court's original jurisdiction. *U.S. Const.* Art. III, § 2; *see, e.g. New Jersey v. New York*, Original 120, April, 1993 (Ellis Island).

For an extensive discussion of the states' power to enter into compacts, and of the historical background and context of its development, *see* Frankfurter & Landis, *The Compact Clause of the Constitution—A Study in Interstate Adjustments*, 34 *Yale L.Rev.* 685 (1925); *see also Note: Interstate Compacts as a Means of Settling Disputes Between States*, 35 *Harv.L.Rev.* 322 (1921); *Note: The Power of the States to Make Compacts*, 31 *Yale L.Rev.* 635 (1922); M. Jenson, *The Articles of Confederation*, (U.Wisc.Press, 1976 Ed.); C. Warren, *The Supreme Court and Sovereign States* (DiCapo Press, 1972 Ed.); F. Zimmerman & M. Wendell, *The Law and Use of Interstate Compacts* (Council of State Governments, 1961).

Nonetheless, the Compact of 1783 is constitutional beyond reasonable debate. *Cf. State v. Barcheski*, 181 *N.J.Super.* 34, 39, 436 *A.2d* 550, 552–53 (App.Div. 1981).

First, states ratifying the Constitution entered the Union with their boundaries, jurisdiction and contractual undertakings as they existed; thus entering subject to their Compact undertakings, except those inconsistent with the Constitution. *Wharton v. Wise*, 153 *U.S.* 155, 171, 14 *S.Ct.* 783, 788, 38 *L.Ed.* 669 (1894). Moreover, whether the Articles of Confederation had any binding force has been questioned. *Wharton, supra,* 153 *U.S.* at 167, 14 *S.Ct.* at 786. Secondly, the consent requirements of both *U.S. Const.* Art. 1, § 10, cl. 3, and of *Art. of Confederation* (1778), Art. VI, are inapplicable to agreements which

As to jurisdiction over crimes and offenses committed on the Delaware River between New Jersey and Pennsylvania, the Compact of 1783 provides, as follows:

[E]ach state shall enjoy and exercise a concurrent jurisdiction within and upon the water, and not upon the dry land ... in such sort ... that all capital and other offenses ... committed on said river, the juridical investigation and determination

---

do not increase the political power of a combination of states as against the central government. *Wharton, supra.* The Compact of 1783 is, arguably, such an agreement. *But see* Zimmerman & Wendell, *supra,* at 23.

Lastly, congressional consent to a compact need not be express, but may be implied from the history of acquiescence and of reliance by the compacting states and the federal government. *Virginia v. Tennessee,* 148 *U.S.* 503, 521–22, 13 *S.Ct.* 728, 735, 37 *L.Ed.* 537 (1892).

This Compact has been the law of both states for 213 years. Both states' courts have relied on its provisions. *See e.g. Comm v. Shaw,* 8 *Pa.Dist.* 509 (Q.S. Bucks 1899); *Comm v. Frazee,* 2 *Phila.* 191 (O. & T. 1857); *Attorney Gen. v. Del. & Bound Brook R. Co.,* 27 *N.J.Eq.* 1 (Ch.1876); *cf. State v. Davis,* 25 *N.J.L.* 386 (Sup.Ct.1856). It was cited in *Wharton, supra,* 153 *U.S.* at 170–71, 14 *S.Ct.* at 787.

In 1953, New Jersey enacted a proposed amendment to the 1783 Compact to permit the construction of certain dams and reservoirs. *N.J.S.A.* 32:20–51. This was part of an enactment dealing with management of the river basin's water supply, *L.* 1953, *c.* 443, p. 2422–23, which recognized (*L.* 1953, *c.* 443, p. 2423–24) litigation pending in the Supreme Court between New York, New Jersey, Pennsylvania and Delaware over their rights to river waters. *New Jersey v. New York,* 347 *U.S.* 995, 74 *S.Ct.* 842, 98 *L.Ed.* 1127 (1954). One of the terms of the decree in that matter called for Pennsylvania to enact corresponding legislation and for same to be submitted to Congress for approval. 347 *U.S.* at 1001, 74 *S.Ct.* at 844. Pennsylvania did so in 1955. 32 *Pa.S.* § 815.46.

Subsequently, the litigant states entered into the Delaware River Basin Compact, *N.J.S.A.* 32:11–D1 *et seq.* 32, *Pa.S.* § 815.101 *et seq.,* 7 *Del.C.* § 6501 *et seq.; McKinney's E.C.L.* § 21–0701 *et seq.,* also agreed to and approved by Congress, P.L. 87–328, Sep. 27, 1961, 75 *Stat.* 688, which also references the Supreme Court's decree. *N.J.S.A.* 32:11D–17, 18.

Congress can be presumed to have been aware of this history, including the Compact of 1783, when it enacted P.L. 87–328, under the recognized principle that it is assumed to know the state of the law when it legislates. *See* 2A *Sutherland, Statutory Construction,* at 817 (5th Ed.1993).

Given this history, it is beyond reasonable debate that the Compact of 1783 has, to the extent congressional approval is required, been implicitly approved. It thus comports with both *U.S. Const.* Art. 1, § 10, cl. 3 and *Art. of Confederation* (1778) Art. VI.

> thereof shall be exclusively vested in the state wherein the offender or person charged ... shall be first apprehended, arrested, or prosecuted.

*N.J.S.A.* 52:28–25, 71 *Pa.S.* § 1805. This provision grants both states concurrent jurisdiction on the waters of the river and provides that a prosecution by the first state to do so precludes a prosecution in the other state.

Neither state had jurisdiction over the Delaware River until the rights of the British crown were extinguished by the Revolution and the Treaty of Paris.[7] Approximately contemporaneously, the Compact of 1783 was negotiated, conferring the right to concurrent jurisdiction. *See State v. Babcock,* 30 *N.J.L.* 29, 34 (Sup.Ct. 1862); *State v. Davis,* 25 *N.J.L.* 386, 387 (Sup.Ct.1856). Although Pennsylvania enacted legislation in 1786, 71 *Pa.S.* § 1811 *et seq.,* asserting and prescribing the manner of exercise of the concurrent jurisdiction by its courts; prior to 1856, New Jersey considered the issue of little importance. *Babcock, supra* at 34.

In *State v. Davis, supra,* it was held that, since New Jersey had not legislatively authorized its courts to exercise the rights to jurisdiction granted in the Compact of 1783, no New Jersey court had power to try a mother who had thrown her child off a ferry into the river between Philadelphia and Camden. *Davis, supra* at 389.

■ In apparent response to this result, the Legislature enacted *L.*1856, *c.* 123, the predecessor to the since amended *N.J.S.A.* 52:28–33.[8] That statute, as presently in force, provides that the concurrent jurisdiction conferred by the Compact of 1783:

---

7. The British surrendered October 19, 1781. A provisional treaty was signed November 30, 1782, and the final treaty signed September 3, 1783, and ratified by Congress January 14, 1784. *See* MacDonald, *Select Documents of the United States, 1776–1861,* 15 (New York, 1968 Ed.).

8. The principal change wrought by the 1953 amendment was to add the Superior Court to the "courts and officers of the county" in the original 1856 legislation. *L.* 1953, *c.* 49.

shall belong to and be exercised by the Superior Court or the courts and officers of the county ... being nearest to the place where such offense ... was committed, as fully as if said place was within the body of such county. . . .

*N.J.S.A.* 52:28–33.[9]

Concurrent jurisdiction means the jurisdiction of two powers over one and the same place. *Wedding v. Meyler,* 192 *U.S.* 573, 584, 24 *S.Ct.* 322, 324, 48 *L.Ed.* 570 (1904). Grants of concurrent jurisdiction over boundary waters are common and have a long history. *See e.g.* Act of Feb. 14, 1859, c. 33, §§ 1, 2, 11 *Stat.* 383 (Oregon Admission Act—concurrent jurisdiction on Columbia and Snake Rivers); Act of April 18, 1818, ch. 67, § 2, 3 *Stat.* 428 (Illinois Statehood Admission Act—concurrent jurisdiction on Wabash and Mississippi Rivers); Act of December 18, 1789, Va. Gen. Assembly;[10] consent: Act of February 4, 1791, 1 *Stat.* 189 (Kentucky–Virginia Compact—concurrent jurisdiction on Ohio River).

---

9. The statute goes on to make describing the offense as having occurred in or upon the Delaware River in such county lawful. In *State v. Cooper,* 93 *N.J.L.* 13, 107 *A.* 149 (Sup.Ct.1919), an indictment describing an offense on the river as having been committed in Penns Grove was dismissed for failing to do so. This is inconsistent with the modern view that an indictment is sufficient if it enables a defendant to know that against which he or she must defend, has sufficient detail to avoid double jeopardy, and to preclude substitution by a trial jury of an offense not charged by the grand jury. *See e.g. State v. Wein,* 80 *N.J.* 491, 497, 404 *A.2d* 302, 307 (1979); *State v. Spano,* 128 *N.J.Super.* 90, 92, 319 *A.2d* 230, 231 (App.Div.1973). Since *Cooper, supra* "exalt[s] technical niceties at the expense of substantial justice", *Spano, supra,* it would not seem that the language "on the waters of the Delaware River" in a complaint or indictment are mandatory, but only permissive. Absent prejudice, amendments changing the place of an offense in an indictment are permitted as being of form, not substance. *See, e.g. State v. Connolly,* 120 *N.J.Super.* 511, 516, 295 *A.2d* 204, 206 (App.Div.1972). Complaints may be amended for any omission or defect, or any variance between the complaint and evidence adduced at trial unless charging a different substantive offense, and provided an adjournment is allowed for surprise. *R.* 7:10–2. In this case there is clearly no surprise to defendant that the charged offenses occurred on the Tacony–Palmyra Bridge. The summonses issued by the Bridge Police recite this.

10. *See Va.Code* § 7.1–6; The full text of the "Act Concerning the Erection of the District of Kentucky into an Independent State", of which the provision for concurrent jurisdiction with any state to be formed out of the territory north and

██ Their primary purpose is "... to avoid any nice questions as to whether a criminal act sought to be prosecuted was committed on one side or the other of the exact boundary in the channel, that boundary sometimes changing by reason of the shifting of the channel." *Nielsen v. Oregon,* 212 *U.S.* 315, 320, 29 *S.Ct.* 383, 384, 53 L.Ed. 528 (1909). When an act violates the laws of both states, the state first acquiring jurisdiction over the person may prosecute, precluding prosecution in the other state. *Id.*

*Nielsen* held, however, that a person cannot be prosecuted in such state for an act committed in the area of concurrent jurisdiction located over the border of the other compacting state which, while violating the laws of the former, is lawful in the latter. *Id.* at 320–21, 29 *S.Ct.* at 384–85. In other words, under that circumstance the offense involved must be prohibited in both states.

That the offenses in the instant case occurred on a bridge over the Delaware rather than "in" or "upon" the river, in the language of the Compact, is of no moment. While no New Jersey case has previously so held, *N.J.S.A.* 52:28–25 and 52:28–33 apply nonetheless. There were no bridges over the Delaware for some 50 years after the Compact was drafted, *Comm. v. Shaw,* 8 *Pa.Dist.* 509 (Q.S. Bucks 1899), and this circumstance was thus not envisioned by the drafters. *Id.*

In *Shaw, supra,* a Pennsylvania court found jurisdiction over an offense committed on the New Jersey side of a wooden foot bridge based on the Compact and the Pennsylvania statutes on the exercise of its grant of concurrent jurisdiction, holding that "... the word 'on' should ... be used in the sense of 'over.'" *Id.* at 510. Similarly, civil jurisdiction in a Pennsylvania court over a case arising out of a motor vehicle accident occurring on the New Jersey side of a bridge was based on the Compact of 1783 in *Domenick v. Sigler,* 23 *Pa.D. & C.*3d 765 (C.P.Phila.1982).

---

northwest of the Ohio River is § 11, is set forth in *Notes and Annotations to Kentucky Revised Statutes,* at xxv (1944).

Similar language such as "on" or "upon" the water in other comparable grants of concurrent jurisdiction on boundary waters has uniformly been construed to include offenses committed "over" the water on a bridge, by the few courts to have considered the issue. *See, e.g. State v. LeGear,* 346 *N.W.*2d 21 (Iowa 1984); *State v. George,* 60 *Minn.* 503, 63 *N.W.* 100 (1895); *State v. Nearing,* 99 *Or.App.* 724, 784 *P.*2d 121 (1989); *Peo. v. Pitt,* 106 *Ill.App.*3d 117, 62 *Ill.Dec.* 3, 435 *N.E.*2d 801 (1982); *Cf. Smoot v. Fischer,* 248 *S.W.*2d 38 (Mo.App.1952) (civil jurisdiction).

The obvious rationale is that the primary purpose of concurrent jurisdiction over boundary waters, expressed in the seminal case of *State v. George, supra,* as "... to prevent the escape of criminals on account of the uncertainty that so frequently arises as to whether the act was committed on one side of the middle of the main channel or the other ...." *George, supra,* 63 *N.W.* at 101, applies with equal force to an offense committed on a bridge as one committed on a boat on the water. *Accord: Comm. v. Shaw, supra,* 8 *Pa.Dist.* at 510.

Like treaties, interstate compacts are generally given a liberal interpretation to promote the objects intended to be accomplished by the parties, especially when the compact was entered into to settle a dispute or controversy. 3 *Sutherland, Statutory Construction* § 64.04 at 273 (5th Ed.1993); *see Massachusetts v. New York,* 271 *U.S.* 65, 46 *S.Ct.* 357, 70 *L.Ed.* 838 (1926). Construing the "upon" language of this compact to also mean "over" promotes the stated purpose of the compacting states to prevent "inconveniences and mischiefs" arising "from the uncertainty of jurisdiction ... on the river Delaware ... in order that law and justice may hereafter in all cases be executed." *N.J.S.A.* 52:28–23; 71 *Pa.S.* § 1801.

Before leaving the Compact's grant of concurrent jurisdiction, one additional phrase requires construction. The Compact of 1783 provides that "the juridical investigation and determination" of an offense occurring in the area of concurrent jurisdiction "... shall be exclusively vested in the state wherein the offender or person

charged ... shall be first apprehended, arrested or prosecuted."
*N.J.S.A.* 52:28–25, 71 *Pa.S.* § 1805. One of the contentions of
defendant is that, because the stop occurred on the dry land of
Pennsylvania, the defendant was there first apprehended and that
state has jurisdiction.

In this connection, however, it should be noted that the
triggering events to the vesting of concurrent jurisdiction are
listed in the disjunctive rather than the conjunctive. When items
in a list are separated by commas with an "or" preceding the last,
the items are disjunctive unless this would subvert the clear
legislative intent. *State v. Smith,* 262 *N.J.Super.* 487, 506, 621
*A.2d* 493 (App.Div.1993); 1A *Sutherland, supra,* § 21.14 at 129.

The intent of the drafters of the Compact was to provide
certainty of jurisdiction and to preclude successive prosecutions by
both jurisdictions. *See Comm. v. Frazee,* 2 *Phila.* 191, 192–93 (O.
& T. Phila.1857). That intent is advanced, not subverted, by
holding that the clear meaning of this language is that jurisdiction
shall be in the state where "any", rather than "all" or "the first",
of the listed events actually results in initiation of a prosecution.

Even though the defendant was stopped in Pennsylvania, the
complaints were forthwith filed in New Jersey in this court. *R.*
7:3–1(b). This filing constitutes the initiation of a prosecution, and
New Jersey is thus the state "wherein the offender ... shall be
first ... prosecuted," *N.J.S.A.* 52:28–25, 71 *Pa.S.* § 1805, and thus
acquired exclusive jurisdiction.

## V.

The sole remaining question is the manner in which the Com-
pact's concurrent jurisdiction and the enabling legislation, *N.J.S.A.*
52:28–33, fit into the municipal court's limited grant of territorial
jurisdiction in *N.J.S.A.* 2B:12–16(a).

Both sides in the instant case misapprehend the meaning of
*N.J.S.A.* 52:28–33 as requiring the exercise of jurisdiction by the
court in *either* state nearest to the situs of the offense, one side

arguing Philadelphia was closer, the other that the physical site of the Philadelphia court is farther away than that of this court. As has been seen, this statute was not a part of the Compact of 1783, but rather was New Jersey's response to the lack of a court in this state prior to 1856 in which concurrent jurisdiction of the Delaware River could be exercised. *See State v. Davis, supra; Comm v. Frazee, supra.*

It is intended to enable New Jersey's courts to exercise *this* state's concurrent jurisdiction on either side of the imprecise state boundary within or upon the river and not on the dry land. Pennsylvania has its own distinct scheme for that exercise by its courts, 71 *Pa.S.* § 1811 *et seq.*, which the initiation of this prosecution made inapplicable. What matters is what New Jersey *county* is nearest to the situs of the offense and, in the case of matters within municipal court subject matter jurisdiction, what New Jersey *municipality* is closest.

*N.J.S.A.* 52:28-33 provides that the concurrent jurisdiction shall be exercised by the Superior Court *or* the courts and officers of the county nearest the site of the offense. Municipal courts are not explicitly mentioned. The use of the phrase "or the courts and officers of the county", however, clearly evinces an intention that this jurisdiction also be exercised by other statutory courts of limited jurisdiction.

County courts were abolished by constitutional amendment in 1978, *N.J.Const.* (1947) Art. 11, § 6; and County District and Juvenile and Domestic Relations Courts were abolished in 1983, *N.J.S.A.* 2A:4-3 *et seq.* (repealed); their judges, jurisdiction and functions transferred to the Superior Court. The only statutory courts of limited jurisdiction established in New Jersey presently are the municipal courts and the Tax Court. Obviously, the Tax Court has no jurisdiction in cases of this nature. *N.J.S.A.* 2B:13-2.

Although municipal courts are granted jurisdiction which is limited, they are courts of record, *Bd. of Health, Weehawken Tp. v. N.Y. Cent. R. Co.*, 10 *N.J.* 284, 292, 90 *A.*2d 736 (1952), exercise

a significant part of the state's judicial power, *Id.* at 290, 90 *A.*2d 736, and are an integral part of the unified judicial system of New Jersey. *Kagan v. Caroselli,* 30 *N.J.* 371, 377, 153 *A.*2d 17 (1959); *Calligy v. Mayor and Council,* 284 *N.J.Super.* 365, 368, 665 *A.*2d 408 (Law Div.1995). Appeals from judgments and orders of municipal courts are taken to the Superior Court, Law Division; and the notice of appeal is filed with the county clerk of the county in which the municipal court sits. Administrative control of municipal courts rests in the Supreme Court, which has directed the Chief Justice to designate an Assignment Judge for each vicinage responsible for administration of all courts therein, including municipal courts. *Kagan, supra; Calligy, supra; R.* 1:1–1; 1:33–1; 1:33–4. Vicinages, except for several consisting of multiple counties, are coextensive with counties. *See R.* 1:33–2(a); *Rokos v. State Dept. Treasury,* 236 *N.J.Super.* 174, 175–76, 564 *A.*2d 1217, 1217–18 (App.Div.1989).

The intent of the drafters of the judicial article of the 1947 Constitution, *N.J. Const. Art.* 6, was to unify and simplify the court system; make it flexible, apportioning judicial business among courts according to volume and type of case; and establish control over administration, practice and procedure. *See* L. Milmed, *The New Jersey Constitution of 1947, N.J.S.A. Const.* at 106. The type of case involved here is one committed to the subject matter jurisdiction of this court. *N.J.S.A.* 2B:12–17(b).

 Given this background, it is clear that the term "courts and officers of the county" embraces the present municipal courts. Their principal predecessor court was a constitutional county office.[11] They are functional units, deciding specific types of

---

11. At the time *N.J.S.A.* 52:28–33 was originally enacted, the New Jersey Constitution of 1844 was in effect. In Art. VI, § 7, par. 1 and Art. VII, § 2, par. 7, cl. 1, it authorized justices of the peace to be elected by the voters of cities and townships. In Art. VII, § 2, par. 7, cl. 2 it provided that, although elected by voters of cities and towns, justices would be commissioned for the county.

Justices of the peace had jurisdiction coextensive with the limits of the county, and held The Small Cause Court, a Magistrate's Court and a Land-

cases, of a unified state system organized by vicinages generally following county lines. Their decisions are appealable to the Superior Court Law Division, appeals being filed with the county clerk, and decided by Law Division judges sitting in the county in which they are located. Thus, for purposes of *N.J.S.A.* 52:28–33, municipal courts are courts of the county in which they sit.

*N.J.S.A.* 2B:12–16(a), the basic grant of municipal court territorial jurisdiction provides that the court has jurisdiction over cases arising within the territory of the municipality in which it sits. It defines that territory, however, as also including property or premises located partly in and partly outside the municipality. *Id.*

The Tacony–Palmyra Bridge is partly within the territorial boundaries of Palmyra, and then extends out of those boundaries, and out of the state, into Pennsylvania. It is property or premises partly in and partly outside the municipality in which this court sits for purposes of *N.J.S.A.* 2B:12–16(a).

As an alternative basis, even though *N.J.S.A.* 2B:12–16 lacks language similar to that involving subject matter jurisdiction, granting jurisdiction over "[a]ny other proceeding where jurisdiction is granted by statute", *N.J.S.A.* 2B:12–17(f.), it is well-recognized that that same principle applies as to territorial jurisdiction.

For example, municipal courts have been granted statewide jurisdiction to issue search and seizure warrants under the Prevention of Domestic Violence Act, *N.J.S.A.* 2C:25–28(j); and may also grant emergent relief under that Act not only when the

lord–Tenant Court. *See* A. Honeyman, *Honeyman's Justice*, 8th Ed. 39, 44, (Newark, 1933). There also existed a plethora of Police Courts, Recorder's Courts and Mayor's Courts with jurisdiction over various offenses. A. Honeyman, *supra*, at 402–20. The first court under the jurisdiction of a justice of the peace was held in East Jersey in 1675. A. Honeyman, *supra*, at 39.

These courts, with considerable confusion and overlap in jurisdiction granted piecemeal in various acts, were the forerunners of the modern municipal court. The justices of the peace were officers of the county; and their courts, courts of the county.

predicate act occurs within its jurisdiction, but also if it has jurisdiction over the place where the defendant resides or where the plaintiff resides or is sheltered, *N.J.S.A.* 2C:25–28(a). And, of course, municipal court judges have statewide authority to solemnize marriages. *N.J.S.A.* 37:1–13. Legislative grants of territorial jurisdiction can thus be found in statutes other than the basic territorial grant in *N.J.S.A.* 2B:12–16.

Even if premises or property partly within the jurisdiction is eliminated as a basis,[12] *N.J.S.A.* 52:28–33 is, accordingly, a statutory grant to the municipal courts of the power to exercise the extraterritorial concurrent jurisdiction created by the Compact of 1783.

## VI.

From this analysis of these statutes can be distilled the following rules governing the exercise of municipal court jurisdiction over an offense which occurs on the Tacony–Palmyra Bridge: (1) either state's courts may exercise jurisdiction over an offense occurring at any point on the bridge which is over the waters of the Delaware River; but (2) not on that portion of the bridge which is over the dry land of the other state; provided that (3) the offense, if it occurs outside New Jersey, must also be a violation of Pennsylvania law; and (4) the courts of the state where a prosecution is initiated acquire exclusive jurisdiction, precluding prosecution in the other state.[13]

---

12. An example would be an offense occurring on a boat *on* the waters of the Delaware River in the area of concurrent jurisdiction. *But see* note 13, *infra*.

13. These principles are equally applicable on the Burlington–Bristol Bridge, the other interstate bridge owned and operated by the B.C.B.C., which connects Burlington County, N.J. with Bucks County, Pa. over the Delaware River. They would also appear to apply to all other non-D.R.P.A. bridges connecting New Jersey and Pennsylvania over the Delaware River, not subject to *N.J.S.A.* 32:4–6. For example, the Delaware River Joint Toll Bridge Commission's police enabling statutes, *N.J.S.A.* 32:10–2; 36 *Pa.S.A.* §§ 3301, 3305, refer, like *N.J.S.A.* 27:19–36.3, to offenses committed "within the jurisdiction of this state (Common-

■ Applying these principles to the instant case, Jorge Garcia's actions relied on by the State to establish violations of *N.J.S.A.* 39:4–97 and 39:4–129 occurred over the waters of the Delaware River and not over dry land of Pennsylvania. Both careless driving, 75 *Pa.C.S.A.* § 3714, and leaving the scene of an accident, 75 *Pa.C.S.A.* § 3743, are offenses under the laws of Pennsylvania, as well as New Jersey. Even though the summonses were issued in Pennsylvania, the prosecution was initiated by the filing of the complaints in this court. This court is a court of the county and municipality nearest the situs of the offenses, which occurred on property partly within and partly without the municipality. By the initiation of the prosecution here, this court acquired exclusive jurisdiction. Prosecution of these acts is precluded in Pennsylvania by this prosecution.

Defendant's motion to dismiss for lack of jurisdiction is, therefore, denied. An appropriate Order will be entered.

---

wealth)'', with no definition of, or reference to, that jurisdiction. *N.J.S.A.* 52:28–33 provides New Jersey with a means to exercise the concurrent jurisdiction conferred under the Compact of 1783. *N.J.S.A.* 52:28–23 to 52:28–46 *et seq.*

These principles would also apply to offenses actually committed *on* the waters of the river, for example, on a boat, but with several additional important considerations. The first and most important is that the Compact of 1783 granted each state exclusive jurisdiction with respect to ships and vessels anchored before a city or town in that state before or after loading or unloading, or when fastened to, or aground on, the shore of that state. *N.J.S.A.* 52:28–25, 71 *Pa.S.A.* § 1805. Also, each state has the right to regulate and guard fisheries annexed to its shores so as to avoid unnecessary interruption by vessels anchoring on the fishing ground or persons fishing under a claim of common right. *N.J.S.A.* 52:28–24, 71 *Pa.S.A.* § 1804.